690 So.2d 980 (1997)
Timothy CONERLY, et al., Plaintiffs-Appellees,
v.
STATE of Louisiana, et al., Defendants-Appellants.
No. 29236-CA.
Court of Appeal of Louisiana, Second Circuit.
March 3, 1997.
*982 Hudson, Potts & Bernstein by Gordon L. James, Monroe, C.T. Williams, Jr., Metairie, for Defendants-Appellants.
Johnson & Placke by Allan L. Placke, West Monroe, for Plaintiffs-Appellees.
Before NORRIS, BROWN and PEATROSS, JJ.
BROWN, Judge.
In this medical malpractice case, a baby delivered by Caesarean section suffered asphyxia which caused severe brain damage, kidney failure and other complications. The child died the day before her fifth birthday and the petition was amended to allege a survival action and add wrongful death claims by her parents.
The trial court, after thoroughly detailing the evidence, concluded that hospital employees provided inadequate care, administered Pitocin after a previous test showed fetal distress and delayed performing an emergency C-section. Sifting through the conflicting expert opinions, the trial court found that this negligence was the cause of the injuries to the baby and awarded a total of over $3,000,000 to plaintiffs; however, this award was reduced to $500,000 pursuant to a legislatively imposed liability cap. Special damages of $41,833.75 for the child's custodial care were also awarded.
Recognizing the trial court's "front row seat" in this drama and affording due regard to its factual findings, we affirm on the issues of negligence and causation; however, we reverse on the legal issue of whether there are separate and distinct statutory limits on survival and wrongful death claims.

FACTS
In the fall of 1984, 30-year-old Claudia Conerly was pregnant with her sixth child. During her first five pregnancies, all of which resulted in the birth of healthy babies, Mrs. Conerly had obtained prenatal care at the Union Parish Health Unit and E.A. Conway Hospital. Mrs. Conerly did not seek prenatal care until the eighth month of her sixth pregnancy because she felt well and had experienced no problems.
December 18, 1984, was Mrs. Conerly's first prenatal appointment at the health unit. By this time, Mrs. Conerly, approximately eight months pregnant, was uncertain of when her last menstrual period (LMP) had occurred; she thought her last period had been in March or possibly April. Without an accurate date for Mrs. Conerly's LMP and because there were no early ultrasound measurements, an accurate prediction of her due date was impossible.
The nurses at the health unit made Mrs. Conerly an appointment at E.A. Conway Hospital on January 2, 1985. Mrs. Conerly was considered high risk because this was her sixth pregnancy and she had not sought prenatal care. Mrs. Conerly did not keep her appointment at E.A. Conway; but she did return to the health unit on January 8. Another appointment was made for her at E.A. Conway for the following day, January 9.
Mrs. Conerly was examined at the E.A. Conway High Risk Clinic by a Dr. Edwards, who performed an ultrasound and fetal non-stress test (NST). Dr. Edwards determined that Mrs. Conerly was approximately 38 weeks pregnant, give or take three weeks.[1] The fetal NST indicated that the baby was in good condition.
Mrs. Conerly returned to the High Risk Clinic on January 14, 1985; again, no problems were noted. Approximately one week later, on January 22 at about 8:00 p.m. when Mrs. Conerly went to bed, she experienced a sudden large gush of liquid from her vagina. She felt no pain and initially thought that her *983 water had broken. Upon turning on the light, however, she realized that the liquid was blood. Mrs. Conerly woke her husband and about 15 minutes later, they left for E.A. Conway. Mrs. Conerly stated that they arrived at the hospital between 9:00 and 9:30 p.m. and that the bleeding had stopped or slowed down by that time.
The Conerlys went directly to the Labor and Delivery Unit. At that time of night, the unit was normally staffed with one first-year resident, one second-year resident in charge of the unit, one R.N., two L.P.N.s and one or two nurses' aides. The more experienced staff physicians and senior residents were generally not at the hospital during the night except when called in because of a problem or emergency. The unit could also call on the E.R. doctors in an emergency situation.
Dr. Ben Anderson, who was training to be an anesthesiologist, was the first-year resident on duty on January 22, 1985, and Dr. James Waddill, who was completing a residency in family medicine, was the second-year resident on duty. Dr. Anderson had only been on the unit for two months and was, according to Dr. Waddill, "relatively inexperienced."
According to Mrs. Conerly, a few minutes after she checked in, she was put in a room and nurses helped her clean up and put on a gown. The hospital records reflect that at 10:40 p.m., a nurse obtained a history from Mrs. Conerly regarding the "sudden gush of blood." Approximately ten minutes later, Mrs. Conerly was seen by Dr. Waddill, the second-year resident on duty. Dr. Waddill questioned Mrs. Conerly about the bleeding episode and because a large amount of blood was involved, he ruled out the possibility that Mrs. Conerly had experienced the normal "bloody show" or blood-tinged mucous discharge that commonly precedes labor.
Dr. Waddill then examined Mrs. Conerly and determined that she was no longer actively bleeding. Dr. Waddill found no vaginal lacerations, that Mrs. Conerly's cervix was closed and that she had no contractions or abdominal pain. At that point, Dr. Waddill's differential diagnoses were placenta previa and abruption placenta.[2] Given her history, Dr. Waddill considered Mrs. Conerly to be at risk. He performed an ultrasound to check for placenta previa, which he ruled out because the placenta was not positioned over the mouth of the womb. The ultrasound did show decreased amniotic fluid, which could have indicated a problem or have simply reflected a normal fluid decrease at term; however, it was considered an increased risk factor.
Mrs. Conerly was connected to a fetal heart monitor (FHM) at about 11:00 p.m. The FHM showed that the baby had a low heart rate of around 88-100 beats per minute, which is considered to be moderate bradycardia. A low heart rate can indicate fetal distress, although it can also be caused by the mother's body position. Mrs. Conerly was turned to her left side and given oxygen and the baby's heart rate responded immediately, returning to within normal range.
At this point, Mrs. Conerly was not in active labor, although she was experiencing occasional irregular contractions. Dr. Waddill still did not know the cause of the bleeding episode or whether the baby had lost any blood and if so, how much. Dr. Waddill was concerned about the lack of prenatal care, Mrs. Conerly's high risk status and her decreased amniotic fluid. Because the bleeding had stopped and the baby's heart rate had stabilized, Dr. Waddill decided to admit Mrs. Conerly for conservative management or "watchful waiting." His admission diagnosis was third trimester bleeding and, as a precaution, he ordered the lab work necessary for an emergency C-section.
Dr. Waddill did not have the authority to order or perform a primary C-section. If he felt that one was needed, he would have had to contact the senior resident who in turn would have consulted a staff physician. As noted previously, when Mrs. Conerly arrived at E.A. Conway, the senior resident and staff physicians were at home.
*984 Dr. Waddill's notes reflect that he finished his examination and admitted Mrs. Conerly at 11:15 p.m. He then turned over her care to Dr. Ben Anderson, the first-year resident. Dr. Waddill does not recall seeing Mrs. Conerly again. The hospital records do not reveal that Dr. Anderson saw Mrs. Conerly that night and Dr. Anderson had absolutely no recollection of Mrs. Conerly. Dr. Anderson did state that had he seen her, he would have considered her "at risk" given her history. According to Dr. Anderson, Mrs. Conerly should have been checked at least every 30 minutes during the night.
From around 11:15 p.m. on January 22 until 6:00 a.m. the following morning, Mrs. Conerly's hospital records are completely blank; there are no written entries in the doctors' or nurses' notes. The only record is the tracings made by the FHM. None of the doctors or nurses have any recollection of the period from 11:15 p.m. to 6:00 a.m. and could not state what, if anything, was done. According to Mrs. Conerly, "at times" during the night different men she presumed were doctors came in to look at the FHM strips and occasionally a nurse came in the room.
The FHM tracings, again the only record of the events of the night of January 22, 1985, show that Mrs. Conerly was never in true labor, although she did experience occasional, irregular Braxton-Hicks contractions.[3] The tracings also showed occasional drops in the baby's heart rate.
A baby in good condition can tolerate contractions and its heart rate will return to normal when the contraction ceases. A baby in poor condition, however, can not tolerate contractions and its heart rate will characteristically be late in returning to normal following a contraction. This is late deceleration and is considered indicative of fetal distress.
The next entry in Mrs. Conerly's chart was made at 6:00 a.m. by the nurse completing her shift, who simply wrote that no bleeding was noted. Dr. Anderson also made an entry at 6:00 a.m. which basically repeated Dr. Waddill's previous entry, though he did add that Mrs. Conerly had shown no significant contractions during the night and that she had rested comfortably with no evidence of bleeding. He further noted that he would discuss Mrs. Conerly's case with the staff and continue conservative management; however, there is no evidence of a staff consult and Dr. Brooks, senior staff physician, stated that Dr. Anderson never discussed Mrs. Conerly with him.
Dr. Mooney, the senior resident in labor and delivery, started his rounds around 7:00 a.m. He immediately began trying to determine the cause of Mrs. Conerly's bleeding episode. Dr. Mooney evaluated Mrs. Conerly's chart and the fetal heart tracings. He noted that the tracings during the night showed irregular contractions and some late decelerations or return of the baby's heart rate to normal. He noted that Mrs. Conerly had received adequate hydration and that she was far from a vaginal delivery because her cervix was neither significantly effaced nor dilated. Dr. Mooney noted no evidence of placenta previa, and Mrs. Conerly's uterus was soft, something not usually consistent with an abruption.[4]
At this point, Dr. Mooney's assessment was inconclusive. The circumstances indicated to him the need to deliver the baby and he immediately ordered an oxytocin test (OCT) to determine whether the baby could withstand the stress of labor. An OCT involves intravenous administration of Pitocin, a hormone that causes uterine contractions, which in turn allows observation of the baby's heart rate and its reaction to the stress of labor. If the baby was able to tolerate labor, Dr. Mooney intended to induce labor and if not, he intended to deliver by C-section.
Mrs. Conerly's chart reveals that an OCT was ordered at 7:15 a.m. and begun approximately five minutes later. With the first contraction, the baby's heart rate showed a prolonged late deceleration. The nurse turned off the Pitocin drip, placed Mrs. Conerly on her left side, administered oxygen *985 and notified Dr. Mooney. The baby's heart rate returned to normal.
It was at that time that Dr. Mooney decided that the baby was unable to withstand the stress of labor. His written assessment was intrauterine pregnancy at term; third trimester bleeding with questionable abruption; and fetal distress. Dr. Mooney immediately began making preparations for a C-section delivery. He placed the obligatory call to Dr. Gary Brooks, the staff physician, for the required consultation and authority to proceed.
Dr. Brooks responded around 7:30 a.m.; he spoke with Dr. Mooney, who related that an OCT had caused late deceleration in the baby's heart rate. Dr. Brooks examined the OCT results, which showed one contraction followed by a prolonged late deceleration. Dr. Brooks did not feel that the first OCT was enough to justify a primary C-section, so he ordered the Pitocin restarted and began reviewing Mrs. Conerly's chart.[5]
Dr. Brooks considered and discussed with Dr. Mooney the differential diagnoses of placenta previa and abruption. He noted that the ultrasound had ruled out placenta previa. Dr. Brooks looked at the fetal heart tracings made during the night and noted occasional variables and spontaneous decelerations of the baby's heart rate not related to a uterine contraction. He also noticed one or two late decelerations during the night in response to contractions. Finally, he noted that Mrs. Conerly's amniotic fluid was decreased.
The Pitocin drip was restarted at 7:50 a.m. Mrs. Conerly signed a C-section consent form at 8:00 a.m.; also at 8:00, the Pitocin was increased. Mrs. Conerly had a small contraction at 8:05 a.m., but Dr. Brooks was unable to detect an actual late deceleration. The OCT produced one more possible late deceleration which did not seem to meet the contraction criteria. At 8:12 a.m., the Pitocin was stopped.
At that time, Dr. Brooks felt that an operative delivery was warranted because the baby would not tolerate labor. Dr. Brooks stated that he concurred with Dr. Mooney's finding of fetal distress.
Contrary to established hospital procedure, Dr. Brooks ordered the C-section without consulting the surgical resident, Dr. LaBarre, the doctor who would be performing the procedure. Although Dr. Brooks decided to perform a C-section around 8:00 a.m., Mrs. Conerly was not brought to the operating room until 9:20 a.m. The baby's heart rate was monitored up until that time and the tracing was "not particularly abnormal," though there was a bit of an increase in the fetal base line.
Christina Lea Conerly was delivered at 9:40 a.m. on January 23, 1985. Christina suffered asphyxia prior to birth, which in turn caused severe brain damage, kidney failure and a host of other complications. Christina was immediately transferred to LSUMC in Shreveport, where she remained until May 1985. She died on January 22, 1990, the day before what would have been her fifth birthday.
Plaintiffs, Timothy and Claudia Conerly, individually and as administrator of their daughter's estate, filed suit against the State of Louisiana through the Department of Health and Human Resources, E.A. Conway Memorial Hospital, Dr. James Waddill and Dr. Charles (Ben) Anderson, seeking damages for injuries sustained by Christina Conerly immediately prior to and during her birth at E.A. Conway on January 23, 1985. Following Christina's death, the petition was amended to present a survival action and add wrongful death claims.
In its written opinion, the trial court found that asphyxia occurred within one to three hours of the delivery and that had the baby been delivered earlier, the injuries would probably have been prevented. The court found that more probably than not the gush of blood prior to Mrs. Conerly's presentation to E.A. Conway was caused by an extremely rare velamentous insertion of the umbilical cord. The court concluded that the baby's injuries were caused by a combination of the blood loss at 8:30 p.m. on January 22, 1985; the failure of the doctors and staff to *986 monitor Mrs. Conerly during the night and notice signs of fetal distress; the second administration of Pitocin after a finding of fetal distress; and the delay in performing an emergency C-section after fetal distress was diagnosed.
The court awarded a total of $3,041,833.75 to plaintiffs; this award was reduced to $500,000 pursuant to the statutory cap set forth by La.R.S. 40:1299.39(B) (West 1985). An additional amount for custodial care was also awarded to Mrs. Conerly.
Both parties have appealed, urging several assignments of error.

DISCUSSION

Expert Testimony
Defendants first argue that the trial court's acceptance of the testimony of Dr. James Anderson regarding interpretation of the FHM strips was erroneous. According to defendants, the court was clearly wrong in ignoring the testimony of three OB-GYN physicians and medical literature and in accepting the completely unsupported speculations of Dr. Anderson in establishing a standard of care.
In a medical malpractice action, a plaintiff must establish by a preponderance of the evidence that the medical treatment fell below the ordinary standard of care and that there is a causal relationship between the alleged negligent acts and the injury sustained. La.R.S. 9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La. 1991); Evans v. Haynie, 26,135 (La.App. 2d Cir. 09/21/94), 643 So.2d 273, writ denied, 94-2589 (La. 12/16/94), 648 So.2d 391; Roland v. Tedesco, 616 So.2d 780 (La.App.2d Cir.1993), writ denied, 619 So.2d 579 (La. 1993).
Appellate review of the trial court's findings in a medical malpractice action is limited. The standard of knowledge, skill and care for physicians is best determined from the testimony of other experts. When the medical experts express different views, judgments and opinions on whether the standard was met in any given case, the reviewing court will give great deference to the trier of fact's evaluations. Evans, supra; Beckham v. St. Paul Fire and Marine Insurance Co., 614 So.2d 760 (La.App.2d Cir.1993); Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App.2d Cir.1991).
It is for the fact finder to evaluate conflicting expert opinions in relation to all the circumstances of the case. Roland, supra; Gibson, supra. Credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which will not be disturbed on appeal in the absence of manifest error. Martin, supra; Iseah v. E.A. Conway Memorial Hospital, 591 So.2d 767 (La.App.2d Cir. 1991), writ denied, 595 So.2d 657 (La.1992).
Dr. James E. Anderson, an obstetrician practicing in the Washington, D.C. area, testified for plaintiffs. Dr. Dale Russell Dunnihoo, a retired LSU professor, testified as an expert obstetrician for defendants.[6] Dr. Dellie Howard Clark, a Monroe area physician, also testified as an expert obstetrician for the defense. Dr. Gary Brooks testified as both a fact witness and an expert obstetrician for the defense. All of these obstetricians expressed opinions as to the required standard of care, including interpretation of the FHM strips.
From his review of the medical records, Dr. Anderson opined that Mrs. Conerly was put in a room at approximately 11:00 p.m. on January 22 and left alone; she received no care between her admission and 6:00 a.m. on January 23. As further evidence of neglect, Dr. Anderson noted that the fetal heart monitor strips were not marked properly. The strips did not show the time the monitor was connected; fetal movement and contractions were not properly marked and differentiated; the only markings were those made by Mrs. Conerly. Further, the initial tracing produced at 11:00 p.m. on January 22 (the first tracing showing bradycardia) was mis-labeled *987 as January 23 and was placed at the end of the strips instead of the beginning.
Dr. Anderson opined that the fetal heart tracings made during the night reflected a baby struggling in a hostile environment. Dr. Anderson identified several "true" late decelerations, i.e. decelerations of the baby's heart rate in response to a uterine contraction. He identified other spontaneous decelerations, which are decelerations in the heart rate unaccompanied by a contraction. Dr. Anderson felt that the multiple decelerations, many of which were not accompanied by contractions, were distressing.
It is Dr. Anderson's opinion that no one really looked at the fetal heart tracings until the senior resident, Dr. Mooney, happened onto Mrs. Conerly while making rounds the next morning. Dr. Anderson opined that Dr. Mooney found the fetal heart tracings sufficiently disturbing that he immediately ordered an OCT, which he terminated after getting a terrible response to the first contraction. Dr. Mooney at that time diagnosed fetal distress and ordered a C-section. In Dr. Anderson's opinion, Dr. Mooney's actions were entirely proper and should have been taken by the residents on duty the night before.
Dr. Dale Dunnihoo disagreed with Dr. Anderson's interpretation of the fetal heart tracings. Dr. Dunnihoo did not think that the tracings showed a need for a C-section. He agreed that the strips showed a number of decelerations, many of which were unaccompanied by uterine contractions. However, in Dr. Dunnihoo's opinion, the significance of any deceleration depends on its relationship to a uterine contraction. He disagreed with Dr. Anderson that repeated decelerations without contractions were a very ominous sign, yet while on the stand reviewing the strips, he pointed to an obvious deceleration not associated with a contraction at # 266 on the strips, and said it "really kind ofmakes you wonder what's going on here."
Dr. Dunnihoo testified that it was not malpractice to administer Pitocin to Mrs. Conerly, despite the FHM tracings generated the night of January 22, 1985. According to Dr. Dunnihoo, it was safe to try Pitocin to figure out what was going on and determine whether the baby could take the stress of labor. He opined that the tracings still did not show an emergency situation as of 8:10 a.m. when the second OCT was terminated. He did notice that the initial mild contraction with the first OCT immediately produced a fairly significant late deceleration at strip # 298. While reviewing the remainder of the tracings, Dr. Dunnihoo remarked that "these decelerations do not have to be very dramatic.... This is suggestive. And I might add, that even this kind of a tracing, if persistent for a long period of time, could cause problems." He opined that the tracings and OCT results were suspicious, and combined with the history of bleeding, were sufficient to warrant a C-section at that time. Dr. Dunnihoo maintained that these tracings did not really constitute fetal distress, nor did they indicate an emergency situation.
In Dr. Dunnihoo's opinion, the blood loss Mrs. Conerly experienced at home the evening of January 22, 1985, caused the baby to go into hypoxia. Mrs. Conerly was not seen at the hospital until 11:00 p.m. By then, Christina would have been hypoxic for 2.5 hours. According to Dr. Dunnihoo, a term infant can only tolerate about 25 minutes of hypoxia. A baby's system begins to shut down its peripheral blood supply in order to get more blood to the vital areas of brain, heart and kidneys. He thinks this process was well involved by the time Mrs. Conerly was seen at the hospital. That is why the baby initially showed bradycardia on the FHM. Dr. Dunnihoo believes that when the nurse administered oxygen and turned Mrs. Conerly on her side, the oxygen revived the vegetative processes of the baby and allowed her to live, but the damage had already been done to her brain and kidneys.
Dr. Dellie Howard Clark stated that the FHM tracings through the night of January 22 were not particularly worrisome. He did not believe it was negligent to perform the oxytocin challenge tests the morning of January 23, since the doctors were trying to determine the baby's well-being. This was not really an emergency C-section and he found no fault with the delay between the *988 decision to perform a C-section and the operative delivery.
Looking at the fetal heart tracings generated the night of January 22, Dr. Gary Brooks opined that the strips did not show any pattern that would have motivated him to intervene during the night, even if he had been consulted by Dr. Waddill or Dr. Ben Anderson.
Because it was within the obstetricians' area of expertise and not within the neonatologists' field to read and interpret fetal heart monitor strips, both Dr. Marcus Hermansen and Dr. Edwin Brown deferred to the testimony of the obstetricians in that area.
In this case, the trial court was faced with conflicting medical testimony regarding interpretation of the FHM strips. The court spent considerable time and effort in evaluating the evidence, making credibility determinations and reconciling conflicts.
The issue is not whether the necessary quantum of evidence was presented to carry plaintiffs' burden of proof but rather whether the trial court's choice between conflicting expert opinion was reasonably supported by evidentiary data. The strictures on our review of basic and inferred facts give due regard to the trial court's first-hand observation and proscribe our authority to disturb those findings unless clearly erroneous. These findings reasonably provide a factual basis for Dr. Anderson's opinion. We cannot say that the trial court was manifestly erroneous or clearly wrong in accepting Dr. Anderson's interpretation of the FHM strips. This assignment of error is without merit.

Causation
Defendants urge that the trial court erred in determining that the cause of Christina Conerly's injury occurred within one to three hours of her birth.
Causation is a factual issue to be determined by the fact finder. Cay v. State, D.O.T.D., 93-0887 (La. 01/14/94), 631 So.2d 393. As noted previously, determination of an expert's credibility is a factual question within the discretion of the trier of fact. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Martin, supra; Roberts v. Cox, 28,094 (La.App.2d Cir. 02/28/96), 669 So.2d 633.
Dr. Marcus Hermansen, pediatrician-neonatologist, was plaintiffs' expert on the issue of causation. Defendants presented the testimony of Dr. Edwin Brown, a pediatrician specializing in neonatal-perinatal medicine. Dr. Dunnihoo also addressed causation for defendants.
It was Dr. Hermansen's opinion that Christina suffered from asphyxia, lack of either oxygen or blood flow. The only determination to be made was when the asphyxia occurred: either at the time of the bleeding episode on January 22 or at some point between the bleeding incident and delivery the following morning.
Dr. Hermansen concluded that the bleeding episode did not cause the injuries suffered by Christina. According to Dr. Hermansen, the asphyxia occurred late in the last few hours before birth, probably within one to three hours of delivery. Had the baby been delivered earlier, the injuries would have been prevented. Factors Dr. Hermansen considered probative of the time of injury included:
1. This was a high risk pregnancy, i.e. there was a high risk of complications. Each of the risk factors exhibited by Mrs. Conerly, decreased amniotic fluid, smoking, bleeding, uncertain due date, were associated with an increased risk of birth asphyxia.
2. Drs. Mooney and Brooks diagnosed fetal distress within three hours of the delivery. Fetal distress precedes birth asphyxia.
3. The pathology exam showed that the placenta was calcified, i.e. it would have had problems meeting the needs of the baby during labor.
4. At birth, the baby had a one minute Apgar score of 2 out of 10 and a five minute Apgar score of 5 out of 10.
5. The doctors at LSUMC made a clinical diagnosis of birth asphyxia. Dr. Hermansen felt this was significant because *989 they saw Christina immediately after the injury and had access to more information.
6. There was no other reasonable explanation for the damage.
Dr. Hermansen opined that the low Apgar scores placed the injury close to delivery. An Apgar score of 2 at birth meant that the baby was close to death; this indicated that something critical was happening to her at or immediately prior to birth. Further, the diagnosis of fetal distress the morning of January 23 was such that an emergency C-section was ordered. This is also evidence that something was happening to the baby shortly before delivery.
According to Dr. Hermansen, the very low Apgar score at birth was caused by asphyxia occurring shortly before birth and could not have been wholly attributed to the bleeding episode the previous evening. Had the baby been in such critical condition since 8:30 p.m., she never would have survived the night. Dr. Hermansen stated emphatically that a baby could not have lived 12 hours in that condition.
Dr. Hermansen noted that the baby's hematocrit at birth was 39%, which is considered mild anemia in a term baby, and indicated that Christina had lost approximately 20% of her blood volume. According to Dr. Hermansen, a 20% blood loss was not enough to cause the damage suffered by the baby. The birth hematocrit revealed that while Christina may have lost some blood the evening of January 22, it was not a substantial blood loss that would cause her to go into shock. Christina's nucleated red blood cell count was very high at 32; Dr. Hermansen stated that normal was below five. He feels that this was indicative of an asphyxial insult not due to blood loss because there was not enough blood lost to cause an asphyxial response.
Furthermore, had the baby lost enough blood at 8:30 p.m. on January 22 to go into shock and suffer catastrophic asphyxia, she would have been in critical condition upon presentation at the hospital. The FHM reading would not have been normal, even after the administration of oxygen. Had Christina suffered catastrophic damage as a result of the bleeding episode, she would have experienced seizures and heart problems during the night which would have shown up on the FHM strips.
Dr. Hermansen opined that it was ridiculous for defendants to suggest that Christina lost enough blood to go into severe shock and suffer extensive damage, then recover and appear normal all night, only to go back into fetal distress the following morning and be delivered in critical condition. It was Dr. Hermansen's opinion that the asphyxia occurred within one to three hours of delivery and that had the baby been delivered earlier, her injuries would have been prevented.
Dr. Dunnihoo opined that the damage to Christina Conerly was done before she ever reached the hospital. As noted previously, Dr. Dunnihoo felt that the blood loss at 8:30 p.m. on January 22 caused the baby to suffer hypoxia. By the time Mrs. Conerly was examined, Christina had been hypoxic for 2½ hours and her peripheral blood supply had begun shutting down. This is why the baby exhibited bradycardia on the FHM. When oxygen was administered and Mrs. Conerly was turned onto her side, the baby's vegetative processes were revived; however, the damage to her brain and kidneys had already occurred.
Dr. Edwin Brown agreed with Dr. Hermansen's opinion that the baby's injuries were caused by a lack of oxygen or hypoxic ischemic damage. Dr. Brown, however, disagreed as to the cause of the oxygen deficiency. It was Dr. Brown's opinion that the baby's injuries were caused by the bleeding episode of January 22.
The amount of blood reported by Mrs. Conerly was considerable. According to Dr. Brown, it could not have been all fetal blood because an infant can not survive such a blood loss. Furthermore, the baby's blood hematocrit at birth was 39%, which indicates that she did lose blood at some time. While Mrs. Conerly did lose blood, it was not a significant amount; her hematocrit and hemoglobin did not change significantly over the course of her stay in the hospital.
In this case, the umbilical cord had a velamentous insertion, which meant that the *990 cord's blood vessels traversed the fetal membranes or amniotic sac. It was Dr. Brown's opinion that the membranes ruptured and tore one or more small blood vessels, allowing amniotic fluid mixed with the baby's blood to escape through the mother's uterus and vagina. Naturally, Mrs. Conerly thought that the red "gush" was all blood.
According to Dr. Brown, the baby lost approximately 20-30% of her blood volume. Contrary to Dr. Hermansen, Dr. Brown did not categorize this as a mild loss. Such a blood loss, if gradual, would not harm her because the body has time to adjust. A sudden blood loss, however, would have caused the baby's body to reduce the blood supply of the brain and organ systems, which would deprive them of the oxygen transported by the blood and cause ischemic hypoxic damage.
Dr. Brown opined that the baby's low heart rate at admission, which was mild bradycardia, was evidence that she was undergoing a reduction in perfusion to the brain, heart and probably kidneys. To explain how the baby's heart rate could have returned to normal after the initial bradycardia, Dr. Brown stated that a baby could resuscitate in utero following an acute blood loss. This resuscitation would take time; it might take as long as six hours for the blood volume to expand.
Dr. Brown reviewed the FHM tracings and stated that he did not see any significant changes in the strips to account for Christina's injuries. The only thing Dr. Brown felt reasonably explained what happened to Christina was the bleeding episode of January 22. This conclusion was supported by her heart rate abnormality on presentation.
Dr. Brown disagreed with Dr. Hermansen's conclusion that the extremely low Apgar scores at birth could tell anything about the time injury occurred. He also disagreed that the blood gas values supported the conclusion that the injury was within 1-2 hours of delivery. According to Dr. Brown, the blood gas values probably reflected the baby's gradual recovery from the bleeding episode.
Dr. Brown noted that the baby's nucleated red blood cell count was elevated, but disagreed that it indicated a significant injury shortly before birth. He also disputed that the baby could not have survived the night if all of the damage was caused by the bleeding episode.
Dr. Brown disagreed with Dr. Dunnihoo's conclusion that all of the damage occurred within 25 minutes of the blood loss. Instead, he felt that the oxygen deprivation resulted from a drop in the baby's blood perfusion, something that takes time. Dr. Brown offered that had Mrs. Conerly been examined earlier than 11:00 p.m., there could have been more evidence of fetal distress. However, he doubted that earlier delivery would have made much difference.
According to Dr. Brown, the damage to the baby occurred after the acute bleeding and during the time she was trying to recuperate from the blood loss. He feels that some element of the injury was occurring consistently through the night of January 22.
The following is excerpted from the trial court's written reasons:
Obviously, causation is the most difficult issue in this case. We know that the baby's asphyxial injuries occurred sometime within 24 hours prior to her birth.... The expert witnesses are directly at odds on their opinions relative to causation, and the known facts do not fit either opinion precisely.
. . . . .
In this case, the court has carefully and repeatedly read and considered the known facts, the medical records, the testimony of the participants, the opinions and credibility of the expert witnesses, and the nuances of those opinions.... [T]he court is aware of the weight that its conclusions will carry herein, and has bent every effort to ensure that its conclusions are the correct ones....
[T]he court is also satisfied that the cause of the bleeding episode does not really matter. Whether it was an abruption or a ruptured blood vessel, the evidence does not support the conclusion that the bleeding episode caused all of the baby's injuries. *991 Rather, the court concludes that, more probably than not, the baby's injuries were caused by a combination of mild blood loss at 8:30 p.m.; the failure of the doctors and staff to properly monitor the baby during the night and notice signs of fetal distress; the second administration of Pitocin after a finding of fetal distress; and the delay in performing an emergency section after fetal distress was diagnosed.
On the issue of whether the amount of blood lost by the baby was sufficient to cause her injuries, the court finds Dr. Hermansen's testimony more persuasive and more in line with common sense. The baby when born was very close to death.... [T]he court agrees with Dr. Hermansen that it is illogical to suggest that the child could have survived all night in such critical condition. Rather, it seems more probable that the child's injuries, although initiated by the blood loss, continued to worsen through the night and the following morning prior to delivery.
The trial court's conclusions relative to causation are rationally supported by credible expert opinion and evidence. We cannot say that the trial court's choice between the conflicting theories regarding causation of Christina's injuries is manifestly erroneous or clearly wrong. This assignment is without merit.

Comparative Fault
Defendants assert that the trial court erred in assessing no fault to Mrs. Conerly.
The trier of fact is owed great deference in allocating fault. Clement v. Frey, 95-1119 (La. 01/16/96), 666 So.2d 607; De Los Reyes v. USAA Casualty Insurance Co., 28,491 (La.App.2d Cir. 06/26/96), 677 So.2d 668. A trial court's findings regarding the apportionment of fault are factual and will not be disturbed on appeal unless they are manifestly erroneous or clearly wrong. Baughman v. State, Dept. of Transportation and Development, 28,369 (La.App.2d Cir. 05/08/96), 674 So.2d 1063.
The following is excerpted from the trial court's written reasons:
There is no question that Mrs. Conerly's failure to seek prenatal care until the eighth month of pregnancy statistically increased the risk of a bad outcome for the pregnancy. However, there is no evidence that her failure to seek prenatal care in any way caused the damages suffered by Christina Conerly.
Furthermore, her failure to seek prenatal care was known to all of her physicians, and there is no serious dispute but that this fact should have increased their vigilance and made them more willing to intervene.
Under the circumstances, the court does not assess any percentage of comparative fault to Mrs. Conerly.
Mrs. Conerly disclosed all pertinent information to her treating physicians; based upon her history, the doctors correctly classified Mrs. Conerly a high risk patient. It was the physicians' failure to apply the vigilance required in such a high risk case that the trial court found lacking and to have caused the damage. We cannot say that the trial court abused its discretion in finding that Mrs. Conerly was not at fault.

Statutory Limitation of Liability
Plaintiffs contended that the liability of E.A. Conway Hospital and the state rested vicariously on the negligence of the hospital's nurses and physicians and independently upon the hospital's failure to provide adequate policies and trained personnel, as well as its failure to enforce existing policies. The trial court found that the nurses and physicians were negligent, but that the staffing, policies and operation of the hospital were reasonable. This distinction is important in determining the applicability of the cap limiting liability.
The reasoning of the trial court and the evidentiary basis thereof have already been thoroughly reviewed. E.A. Conway is a teaching hospital employing a team concept. The trial court found that the policies in force were appropriate and despite the alleged shortcomings, were the best available method of providing competent medical care while training physicians. It was not the hospital's policies that were faulty, but rather that its physicians and nurses failed to follow the guidelines. We can not say that this *992 finding by the trial court was not rationally supported by competent evidence. Thus, we accept the trial court's conclusion that liability was vicariously based on the negligence of the physicians and health care providers and that the hospital was not directly negligent through the lack of proper protocol, procedures or staffing.
Prior to its amendment in 1995 and at the time pertinent to this case, the state constitution provided that the state was not immune from liability for the injury to a person. La. Const.Art. XII, § 10. Thus, in Chamberlain v. State through Dept. of Transportation and Development, 624 So.2d 874 (La.1993), a cap limiting the state's liability to $500,000 under La.R.S. 40:1299.39(B) was declared unconstitutional. Chamberlain, however, recognized that the constitutional proscription did not prevent the legislature from affording the state the same substantive defenses as were available to private parties.
In Butler v. Flint Goodrich Hospital, 607 So.2d 517 (La.1992), cert. denied, 508 U.S. 909, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993), the court held that a malpractice victim's recovery against a private health care provider could be limited constitutionally. Thereafter, the cap provided to private health care professionals was found to apply to state employed physicians and health care professionals, but not to the state for its direct negligence. See Hampton v. Greenfield, 576 So.2d 630 (La.App. 4th Cir.1991), writ denied, 581 So.2d 686 (La.1991). Thus, prior to the 1995 amendment, the state was fully liable for its independent or direct negligence; although its vicarious liability was limited by the same $500,000 cap available to state health care providers. Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094 (La.1985).
Because E.A. Conway's and the state's liability is vicarious, not independent, the cap or limitation on liability set forth in La.R.S. 40:1299.39 is applicable.

Number of Claims
In January 1985, La.R.S. 40:1299.39 provided in part:
(B) Limitation of liability.... [N]o judgment shall be rendered, and no settlement or compromise shall be entered into for the injury or death of any patient in any action or claim for an alleged act of malpractice in excess of five hundred thousand dollars plus interest and costs.
(C) Coverage.... [T]he state shall pay damages, interest, cost of investigation and defense, and any other costs in connection with any claim lodged against any health care provider ... for an alleged act of medical malpractice, resulting in the injury or death of a patient up to the limit set forth in this Part.
The supreme court in Taylor v. Giddens, 618 So.2d 834 (La.1993), distinguished between wrongful death and survival actions:
Although both actions rise from a common tort, survival and wrongful death actions are separate and distinct. Each right arises at a different time and addresses itself to the recovery of damages for totally different injuries and losses. The survival action comes into existence simultaneously with death and permits recovery only for the damages suffered by the victim from the time of injury to the moment of death.... On the other hand, the wrongful death action does not arise until the victim dies and it compensates the beneficiaries for their own injuries which they suffer from the moment of the victim's death and thereafter. Wrongful death damages compensate beneficiaries for their own injuries.
... [T]he victim's medical malpractice claims and the victim's family's claims, such as for loss of consortium, exist from the inception of the tortious act, omission or neglect. Likewise, the survival action, which is a derivative of the malpractice victim's action, is linked to the inception of the tortious act, omission or neglect. The action is based upon the victim's right to recovery being transferred by operation of law to the beneficiary ... In contrast, the wrongful death action does not necessarily come into existence simultaneously with the malpractice action or even come into existence while the victim's malpractice action *993 is viable.... Though it may have its genesis in an act of malpractice, a wrongful death action is not a malpractice action. From its inception, the action exists only in favor of the victim's beneficiaries.
Taylor, 618 So.2d at 840-841 (citations omitted).
In Ly v. State through Dept. of Public Safety & Corrections, 633 So.2d 197 (La.App. 1st Cir.1993), writ denied, 93-3134 (La. 02/25/94), 634 So.2d 835, plaintiffs were the five surviving children of a vehicle's driver and occupant who were killed when their stalled car was rear-ended by a state trooper. Plaintiffs' claims included their parents' personal injury/survival actions and their own wrongful death claims. At issue was the applicability of the cap provided by La.R.S. 13:5106(B)(2).
The First Circuit noted the recent supreme court decision of Chamberlain declaring La.R.S. 13:5106(B)(1) to be unconstitutional. Therefore, the damages for Mr. and Mrs. Ly's survival actions were not subject to any monetary limitation. The court then noted that La.R.S. 13:5106(B)(2), which provided a limitation of liability for wrongful death actions, had not been declared unconstitutional.
The First Circuit concluded that each child could have brought suit separately for the wrongful death of the Lys. They were thus each entitled to a separate legal cap:
Each party's demand for enforcement of a legal right is regarded as a separate action which may be cumulated in a single suit where there is a community of interest, each action is within the jurisdiction of the court and in the proper venue, and all actions are mutually consistent and employ the same form of procedure. La.C.C.P. art. 463; Ryland v. Liberty Lloyds Insurance Co., 617 So.2d 583, 590 (La.App. 3d Cir.1993). The mere fact that all actions were brought together should not serve to penalize plaintiffs. Each child has a separate cause of action against defendants as a result of the child's loss of his or her parents.
Ly, 633 So.2d at 207.[7]
In the instant case, there are three claimants. Timothy Conerly, on behalf of his daughter, asserted a claim for her injuries arising out of defendants' medical malpractice. Upon Christina's death the petition was amended to allege a survival action. In addition, Mr. Conerly asserted a wrongful death claim seeking damages for mental anguish and loss of companionship, love and affection. Claudia Conerly also sought damages for her daughter's wrongful death, including mental anguish and loss of companionship, love and affection.
Though they may have arisen from the same act of medical malpractice, Mr. and Mrs. Conerly's wrongful death claims are separate from the claim of the child. Taylor, supra. The injuries to these parents were distinct from the injury suffered upon the child and each parent is entitled to damages arising out of their daughter's wrongful death. La.C.C. art. 2315.2. The medical malpractice statute implicated in this case provides a monetary limitation or cap on recovery "in any action or claim" or "in connection with any claim."
The legislature has created a special scheme of compensation for those injured by medical malpractice. In the process, the substantive caps and procedures established by the legislature were particularly detailed. The potential adverse effect of the medical malpractice act is that persons catastrophically injured by medical negligence are subject to reduced quantum recovery as a consequence of the cap on damages. Rodriguez v. Louisiana Medical Mutual Insurance Co., 618 So.2d 390 (La.1993).
As noted by the supreme court, statutory interpretation is guided by the principle that a statute such as the medical malpractice act, which takes away common or natural rights, is to be strictly construed and not extended beyond its obvious meaning. Descant v. Administrators of Tulane Educational Fund, 93-3098 (La. 07/05/94), 639 *994 So.2d 246; Rodriguez, supra. When a statute grants immunities or advantages (such as the medical malpractice act's cap) to a special class (state health care providers) against the general public, the claims of the special class must be strictly construed. Id.
Therefore, we find that La.R.S. 40:1299.39, the provision of the public medical malpractice act limiting the rights of persons to recover for injuries or death arising out of the negligence of a state health care provider must be strictly construed. As applied to the particular circumstances of this case, we find that the cap applicable to the survival claim is separate from the parents' wrongful death claims.[8]
In its supplemental opinion, the trial court discussed the factors it considered in determining damages. The court then specifically set the award for Mrs. Conerly's wrongful death claim at $400,000 and Mr. Conerly's claim at $100,000. We find no abuse of the trial court's wide discretion in these awards.

CONCLUSION
For the above reasons, we affirm the judgment of the trial court in all respects except for the trial court's application of La.R.S. 40:1299.39 to limit plaintiffs' recoverable damage to $500,000.
We therefore amend the judgment to recognize that the cap applicable to plaintiffs' survival action is separate from the wrongful death claims.
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein favor of plaintiffs, Timothy Ray Conerly and Claudia Sue Conerly, and against the defendants, State of Louisiana through its Department of Health and Human Resources, E.A. Conway Memorial Hospital, Dr. James Waddill and Dr. Charles Anderson, jointly, severally and in solido for the sum of $500,000 for their survival action claim, together with legal interest thereon as provided in La.C.C. art. 2924 from date of judicial demand, January 17, 1986, until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Timothy Ray Conerly, and against the defendants, State of Louisiana through its Department of Health and Human Resources, E.A. Conway Memorial Hospital, Dr. James Waddill and Dr. Charles Anderson, jointly, severally and in solido for the sum of $100,000 for his wrongful death claim, together with legal interest thereon as provided in La.C.C. art. 2924 from date of judicial demand, January 17, 1986, until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Claudia Sue Conerly, and against the defendants, State of Louisiana through its Department of Health and Human Resources, E.A. Conway Memorial Hospital, Dr. James Waddill and Dr. Charles Anderson, jointly, severally and in solido for the sum of $400,000 for her wrongful death claim, together with legal interest thereon as provided in La.C.C. art. 2924 from date of judicial demand, January 17, 1986, until paid.
AS AMENDED, AFFIRMED at defendants/appellants' cost.
NOTES
[1] A normal term pregnancy is 42 weeks; as of January 9, 1985, Mrs. Conerly was somewhere between one week and six weeks from delivery.
[2] Placenta previa, which involves extensive third trimester bleeding, occurs when the placenta is between the baby and the mouth of the womb. Abruption placenta, which also involves extensive third trimester bleeding, occurs when the placenta partially tears away.
[3] These irregular contractions precede true, active labor and do not lead to dilation of the cervix.
[4] Abruption also tends to trigger sustained uterine contractions, which were not present in this case.
[5] A "textbook" positive OCT involves three uterine contractions in a ten minute period, at least two of which are followed by late decelerations of the baby's heart rate.
[6] Dr. Dunnihoo was the chief of the OB-GYN section at E.A. Conway in January 1985. He knew all the involved physicians personally and was responsible for supervision of the OB-GYN unit, physicians and staff.
[7] After reduction for the fault attributed to their parents, each child's award was less than $500,000. The total awarded to the children for their parents' wrongful death, however, was $983,235.
[8] In Hollingsworth v. Bowers, 96-257 (La.App. 3d Cir. 12/30/96), 690 So.2d 825, the Third Circuit concluded that the medical malpractice cap set forth in the private medical malpractice act, La. R.S. 40:1299.42, is per patient rather than per plaintiff or claim. Although both mother and child were patients, the court in Hollingsworth ultimately concluded that Ms. Hollingsworth's claim for loss of consortium was derived from the injuries sustained by her infant son and that the $500,000 limitation of liability set forth in La.R.S. 40:1299.42 was exhausted by the child's award, thus extinguishing the mother's derivative claim. As stated previously, a wrongful death claim exists independently of and is distinct from the child's medical malpractice claim. We note that the ambiguity of the statute, however, was clearly argued by the two dissenting opinions.