JjPEATROSS, J.
This appeal arises out of the State of Louisiana’s overpayment of a damage award in an underlying medical malpractice suit. The State filed suit naming as defendants Ms. Conerly and her counsel in the original medical malpractice action, Allan L. Placke, Don H. Johnson and Johnson & Placke (collectively referred to herein as “Defendants”), seeking return of the overpayment. The parties filed cross motions for summary judgment. The trial court granted the State’s motion for summary judgment and denied Defendants’ motion. Defendants now appeal and the State has answered the appeal. For the reasons stated herein, we affirm.

FACTS and PROCEDURAL BACKGROUND

Timothy (now deceased) and Claudia Sue Conerly (“Conerlys”) sued E.A. Conway Memorial Hospital (referred to herein as the “State”), a state-owned medical institution, for damages for injuries sustained by their infant daughter, Christina, during and immediately prior to her birth. After trial of the medical malpractice claim, the State was found solely liable for Christina’s “catastrophic” injuries[1]; and, in its opinion, the trial court stated that *892 actual damages were $3,041,838.75, with legal interest due from date of judicial demand until paid. This amount was then reduced to a single award | aof $500,000, exclusive of custodial care and interest, due to the statutory cap on recoveries in medical malpractice cases under La. R.S. 40:1299.39. On appeal, this court affirmed on the issue of liability, but held that each plaintiffs claim was distinct and subject to separate caps. Timothy Conerly, et al., v. State of Louisiana, et al., 29,236 (La.App.2d Cir.3/3/97), 690 So.2d 980, writ denied, 97-0804 (La.3/13/98), 712 So.2d 864, writ granted, 97-0871 (La.3/13/98), 712 So.2d 859, and rev’d by, Timothy Conerly, et al., v. State of Louisiana, et al., 97-0871 (La.7/8/98), 714 So.2d 709. The supreme court reversed on the cap issue alone, applying a single cap (liability and amount of damages affirmed). Timothy Conerly, et al., v. State of Louisiana, et al., supra.
Prior to the supreme court’s decision, the Conerlys’ counsel wrote a letter advising the State’s counsel that his calculation of the amount due to The Conerlys was $1,174,994.26 (including interest until March 31, 1998), and that, from March 31 forward, legal interest would accumulate at $108.27 per day. The State accepted the figures as correct and responded that payment would be delayed pending the decision of the supreme court. In July, after the supreme court’s decision, and at the State’s request, a second copy of this letter was furnished to the State’s counsel with an updated figure of $1,199.147.47 (including interest through July 31, 1998). On August 20, 1998, the State tendered a » check in the amount of $1,888,973.99 along with a “Satisfaction of Judgment” to Ms. Conerly. According to the State, the correct figure was $1,188,973.99; in the processing of the request for the check, an “8” was inadvertently placed in |sthe hundred thousandth position instead of a “1.” This mistake amounted to an overpayment of $700,000.
On receipt of the incorrect check, Ms. Conerly’s attorney disbursed the proceeds to her and filed the Satisfaction of Judgment into the record.[2] Subsequently, the State discovered that it had paid more than the amount judicially enforceable against it by statute. As previously stated, the State brought the present action to recover the amount it had overpaid and the parties filed cross motions for summary judgment. The trial court granted the State’s motion and denied Defendants’ motion, finding that the State was entitled to return of the overpayment because it lacked the “capacity to feel the sort of strong moral duty or duty of conscience that is required to create a natural obligation.” The trial court further found that both attorneys, the law firm and Ms. Con-erly were jointly and severally liable for return of the overpayment. Finally, finding that the attorneys did not act in bad faith in retaining the funds, despite their knowledge of the overpayment, the trial court required that they pay interest from the date of judgment only, rather than from the date of judicial demand. Defendants appeal and the State has answered the appeal requesting additional interest under La. C.C. art. 2303.

DISCUSSION

Defendants argue that the trial court’s judgment finding the State liable for in excess of three million dollars created a natural obligation supporting the payment of damages above the $500,000 statutory cap. 14According to Defendants, the trial court’s conclusion in this case implicitly holds that the existence of a natural obli *893 gation depends on the subjective intent of the debtor, which is not the appropriate inquiry in making such determination. In addition, Defendants assert that the Satisfaction of Judgment drafted by the State and executed by the parties signified the finality of all litigation between the parties; and, therefore, the State’s action for recovery of the overpayment should be dismissed. The State argues that it is not capable of forming the subjective intent necessary to support a natural obligation and, in fact, chose to limit its duty to pay injured plaintiffs in medical malpractice actions by enacting the statutory cap on recovery in such cases. In addition, as previously stated, the State has answered the appeal seeking interest from the date of judicial demand pursuant to La. C.C. art. 2303, rather than the date of judgment as ordered by the trial court.
We note that appellate courts review summary judgments de novo under the same criteria that govern the trial courts’ consideration of whether summary judgment is appropriate. Kennedy v. Holder, 33,346 (La.App.2d Cir.5/10/00), 760 So.2d 587; Fuggins v. Burger King, 33,473 (La.App.2d Cir.5/10/00), 760 So.2d 605. We are not, therefore, constrained by the manifest error/clearly wrong standard in reviewing the trial court’s grant of the State’s motion for summary judgment. We will first address the arguments presented in Defendants’ appeal.

Satisfaction of Judgment

Since Defendants argue that the Satisfaction of Judgment should operate to preclude the action by the State for overpayment of the judgment, |Kwe will address this argument first. The judgment rendered in the underlying medical malpractice action on May 7, 1996, including interest, was in the amount of $541,833.75. The Satisfaction of Judgment executed by the parties reads, in pertinent part:
THE JUDGMENT rendered and recorded in favor of Timothy Ray Conerly, Individually and as Administrator for the Estate of his Minor Child, Christina Lea Conerly and Claudia Sue Conerly, rendered and recorded against defendant State of Louisiana through the Department of Health and Human Resources, E.A. Conway Memorial Hospital, Dr. James Waddill and Dr. Charles Anderson, has been fully satisfied and paid. This satisfaction of judgment is authority for the Clerk of Court to cancel and erase from the records of Ouachita Parish that certain Judgment dated May 7, 1996 and filed in favor of Timothy Ray Conerly [et al] ... in the amount of FIVE HUNDRED FORTY ONE THOUSAND EIGHT HUNDRED THIRTY THREE DOLLARS AND 75/00 ($541,833.75); together with interest allowed by law and all court costs....
The State argues that the above language does not speak to the issue presented in this case and does not amount to a waiver of its right to further legal action to recover an inadvertent overpayment of the May 7, 1996 judgment. We agree. The document expressly states that it applies to the judgment rendered on May 7, 1996. As the trial court noted, the satisfaction of judgment was filed prior to the State’s learning of the overpayment and does not • contain any language suggesting that the State intended to prospectively waive any right to seek recovery in the event of an overpayment. There simply is no evidence that the document constitutes a compromise of anything other than the May 7, 1996 judgment itself. In fact, in a letter dated October 23, 1998, Defendant Allan Placke acknowledged that the May 7, 1996 judgment had been overpaid, writing | B“[i]t does appear that the State paid more than *894 the value of the judgment....” This argument is without merit.

Natural Obligation

The first inquiry in determining whether a natural obligation exists on the part of the State in the case sub judice is to decide if, in fact, a juridical person such as the State of Louisiana can ever satisfy the requirements of a natural obligation. In answering this question, we begin with the premise that no Louisiana court has ever found a juridical person to be the obligor of a natural obligation.[3] Our analysis, therefore, begins with the treatises on the origin and development of the law on natural obligations. After an exhaustive review of the literature, we conclude that a juridical person such as the State of Louisiana is incapable of forming the conscious moral feeling required to have a natural obligation.
The Civil Code articles on natural obligations are as follows:
Art. 1760. Moral duties that may give rise to a natural obligation.
A natural obligation arises from circumstances in which the law implies a particular moral duty to render a performance.
Art. 1761. Effects of a natural obligation.
A natural obligation is not enforceable by judicial action. Nevertheless, whatever has been freely performed in compliance with a natural obligation may not be reclaimed.
|7A contract made for the performance of a natural obligation is onerous.
Art. 1762. Examples of circumstances giving rise to a natural obligation. Examples of circumstances giving rise to a natural obligation are:
(1) When a civil obligation has been extinguished by prescription or discharged in bankruptcy.
(2) When an obligation has been incurred by a person who, although endowed with discernment, lacks legal capacity.
(3) When the universal successors are not bound by a civil obligation to execute the donations and other dispositions made by a deceased person that are null for want of form.
Nowhere in the Civil Code is the term “natural obligation” precisely defined and our courts have construed the listing of examples of such obligations as illustrative and not exclusive. Gray v. McCormick, 94-1282 (La.App. 3rd Cir.10/18/95), 663 So.2d 480; Muse v. St. Paul Fire & Marine Insurance Company, 328 So.2d 698 (La.App. 1st Cir.1976). The determination of whether a natural obligation exists, therefore, depends on the facts of each particular case.
The concept of natural obligations subsumes the “reality” of a moral duty. Litvinoff, The Law of Obligations § 2.3, 5 Louisiana Civil Law Treatise (1992). In other words, there must exist a moral duty, described as a duty of conscience, in order for a natural obligation to arise. *895 The moral duty is “the imperative feeling that something ought to be done or not done or given” and must be “so strongly felt by a person that his conscience mil not be appeased unless he renders to another a certain performance.” Id. | ROnce such a duty is felt with such a compelling force, it becomes part of the “structure” of the natural obligation. Id.
We do not believe that a juridical person such as the State of Louisiana is capable of feeling a moral compulsion so intense that it can only be appeased by satisfaction of the duty.[4] The trial court was correct in concluding that the State of Louisiana is not capable of having a natural obligation.
Assuming, arguendo, that there exist circumstances which would support a natural obligation on the part of a juridical person such as the State of Louisiana, such circumstances are not present in the undisputed facts of this case. Our courts have set forth four requirements which must be present in order for a duty to be considered a natural obligation:
(1) The moral duty must be felt towards a particular person, not all persons in general.
(2) The person involved feels so strongly about the moral duty that he truly feels he owes a debt.
(3) The duty can be fulfilled through rendering a performance whose object is of pecuniary value.
(4) A recognition of the obligation by the obligor must occur, either by performing the obligation or by promising to perform. This recognition brings the natural obligation into existence and makes it a civil obligation.
Litvinoff, § 2.4; Terrell v. Nando, 33,242 (La.App.2d Cir.5/10/00), 759 So.2d 1026; Thomas v. Bryant, 25,855 (La.App.2d Cir.6/22/94), |n639 So.2d 378. All four requirements must exist to support a natural obligation. In the case sub judice, we find that at least the first two of these requirements have not been met. These two requirements provide the focus of our discussion and we begin with the second of the two requirements regarding the strength of the feeling of the moral duty by the alleged natural obligor, or, in this case, the State.
Defendants argue that the trial court’s focus on the subjective intent of the alleged natural obligor was incorrect. While we agree that it is not the sole criterion on which the finding of a natural obligation should be based, we do agree with the State that the intent of the alleged natural obligor is relevant to the determination of whether the alleged natural obligor felt the moral compulsion necessary to transform his moral duty into a natural obligation. In this regard, Litvi-noff states that “the person’s [alleged natural obligor’s] belief in the existence of the moral duty is ... as important as its reality....” See also Thomas v. Bryant, supra. In the present case, the State has clearly expressed its intent not to have a moral duty to pay any judgment that exceeds $500,000. This intent was expressed by the State in the passage by the legislature of La. R.S. 40:1299.39, which contains the statutory cap on recovery in medical malpractice actions against the state. We can find no support in the record for the conclusion that the State experienced strong, forceful moral compulsion to pay Ms. Con-erly an amount greater than it had decided *896 to pay all other successful plaintiffs in medical malpractice cases.
Defendants emphasize that voluntary payment of a natural obligation through error or mistake does not allow recovery of the payment. The Civil _[iiCode makes this clear.[5] This rule of law, however, is never reached if there is, in fact, no natural obligation in the first place; and, in order to find a natural obligation, as previously explained, there must exist a moral duty to pay. This is a separate and distinct inquiry from the later determination (after a natural obligation is found to exist between the two parties) of whether the erroneous payment was voluntary, although in error, and, thus, not recoverable. Litvinoff explains:
If the conclusion is that no natural obligation arose from a certain situation, that is so because, for the lack of a clear object, the moral duty involved is not sufficiently precise to allow the court’s conviction that it was the force that prompted the alleged debtor to act.
Litvinoff, § 2.6 at p. 86. Applying this logic to the present case, we conclude that a natural obligation did not arise from the trial court’s assessment of actual damages in this case. This is so because there is no moral duty owing from the State to Ms. Coneriy in particular that is “sufficiently precise” to support our conviction that it was the moral duty or compulsion on the part of the State which prompted the overpayment of the judgment. With no underlying natural obligation, the fact that the payment made to Ms. Coneriy was made in error is irrelevant.
The scenario in the case sub judice is different from the scenario envisioned by article 1761 and the principle that a payment on a natural obligation, even if made in error or by mistake, is not recoverable. The object of the “no recovery if paid in error” principle is to prevent a debtor who is bound by a natural obligation, i.e., feels a strong moral duty to pay a Indebt which is not enforceable against him, and makes payment on the debt, from later deciding that he wants the payment back. This is the situation which article 1761 is designed to prevent. See also Litvinoff, § 2.22 at p. 41.
Litvinoff next explains that not every moral compulsion transforms into a natural obligation. The moral duty must be owed to a particular person and not to a class of persons in general. This is the basis for the first requirement. In the case sub judice, we believe it clear that, assuming the State owed a moral duty under the circumstances of this case, it would be a duty to the class of persons, generally, who are awarded actual damages in excess of the amount which the legislature has deemed can be judicially enforced against the State in a medical malpractice action. It would not be a moral duty felt by the State for the specific loss sustained by Ms. Coneriy, or any other particular plaintiff.
Since we find that the first two requirements for the existence of a natural obligation are not met under the undisputed facts presented in this case, we conclude that the trial court correctly granted the State’s motion for summary judgment. We will now address the issue raised by the State’s answer to the appeal.

Additional Interest to the State; Bad Faith of Defendants

The trial court declined to award the State pre-judgment interest on the amount of the overpayment. In its answer to the appeal, the State seeks interest from the *897 date of judicial demand, pursuant to La. C.C. art. 2303. That article provides as follows-.
h¡A person who in bad faith received a payment of a thing not owed to him is bound to restore it with its fruits and products.
The trial court found that Defendants presented a colorable argument for their retaining the overpayment and, therefore, concluded that they were not in bad faith for purposes of article 2303 sanctions. Thus, the question before this court is whether or not the undisputed facts of this case constitute bad faith on the part of Defendants. If not, then the trial court was correct in finding that, as a matter of law, the State is not entitled to pre-judgment interest under article 2303.
First, we note that the record makes clear that Mr. Johnson and Mr. Placke were aware of the State’s overpayment upon receipt of the check. Despite this knowledge, they deposited the check into their trust account and disbursed the proceeds to Ms. Conerly, retaining a large sum for attorney fees and case costs. See footnote 3, supra. In addition, the two attorneys’ position, once they became aware that the State was seeking return of the overpayment, was that Ms. Conerly was in possession of the entire overpayment. In other words, Mr. Johnson and Mr. Placke argued that the portion of the proceeds retained by them was not part of the overpayment. Although, at first glance, the conduct of Ms. Conerly’s attorneys appears questionable, we are constrained to agree with the conclusion of the trial court. The argument advanced by Defendants (that the State was bound by a natural obligation to pay the actual damages awarded to Ms. Conerly) was advanced with the belief that it was a good faith argument for the extension of existing law. As noted earlier in this opinion, no Louisiana court has found that a juridical person such as the Instate of Louisiana is capable of having a natural obligation. Further,’we believe that there was a color-able argument for extending the concept of natural obligations to the State in situations where a court has determined that á plaintiff has been damaged by the State in an amount greater than that which is judicially enforceable against it. The October 23, 1998 letter, mentioned above, from Mr. Placke to counsel for the State cites the Muse case and makes clear that Defendants were acting under the belief that they had a good faith argument for retaining the overpayment. As such, there can be no bad faith on the part of Defendants and no article 2303 sanctions are warranted. We find, therefore, as a matter of law, that the State is not entitled to pre-judgment interest under article 2303.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. Costs are assessed to Defendants Allan L. Placke, Don H. Johnson, Johnson & Placke and Claudia Sue Conerly.
AFFIRMED.

. Ms. Conerly was pregnant and at full term with Christina, her sixth child, when she began hemorrhaging and was rushed to E.A. Conway Memorial Hospital. She was left unattended from her arrival at 11:15 p.m. until 6:00 a.m. the following morning. When she was examined, the baby was in fetal distress and it was determined that an emergency C-section was necessary. Rather than performing the section immediately, however, the doctors started her on a pitocin drip, which is a drug used to induce labor. Approximately an hour and a half later, the C-section was performed. Christina was born alive, but in poor condition. She suffered severe brain damage, seizure disorders, right-sided tension pneumothorax, chronic renal failure, microcephaly and other complications due to a lack of oxygen prior to birth. Christina lived to age five, at which time she weighed only 30 pounds. She could not feed herself, use the bathroom, hold her head up[1]* or sit unaided or make any sound other than to cry or coo. She had seizures, wore braces on her legs and underwent hip surgery. She died from aspirating vomit because she was unable to roll herself over. Ms. Conerly took care of Christina on a daily basis and tried to give her some quality of life.

. The State also notes that the disbursement statement indicates deductions for attorney fees in the amount of $632,401.92 (1/3 of $1,897,205.77) and $40,000 for case costs.

. Defendants rely on Muse v. St. Paul Fire and Marine Insurance Company, 328 So.2d 698 (La.App. 1st Cir.1976), in support of the proposition that feelings sufficient to support a natural obligation are imputed onto the State. Defendants misinterpret the holding of Muse. In Muse, the court determined that, while a charity hospital does not have an action for payment of medical services rendered to an indigent, the indigent, nonetheless, owes a natural obligation to the charity hospital for payment of medical services rendered. There was no finding in Muse regarding whether the State is capable of feeling the requisite moral duty required to owe a natural obligation.

. There is also a question of whether or not the State's overpayment of the judgment may have constituted an ultra vires act, i.e., an act beyond the powers granted to the agency. In other words, we question whether the agency had the authority to pay more to Ms. Conerly than the amount for which the State was cast in judgment.

. Comment (b) to article 1761 states that "... this Article means that the performing party must have acted without outside compulsion by fraud or violence. It does not mean that his performance cannot have been induced by error....”