715 So.2d 756 (1998)
Faye Hezeau, Wife of/and Lester HEZEAU
v.
PENDLETON METHODIST MEMORIAL HOSPITAL, et al.
In re MEDICAL REVIEW PANEL FOR the CLAIM OF Faye Hezeau, Wife of/and Lester HEZEAU.
Faye Hezeau, Wife of/and Lester HEZEAU
v.
PENDLETON MEMORIAL METHODIST HOSPITAL, et al.
Nos. 97-CA-1865 to 97-CA-1867.
Court of Appeal of Louisiana, Fourth Circuit.
July 15, 1998.
Rehearing Denied August 14, 1998.
*757 R. Ray Orrill, Jr., Robert F. Shearman, Leslie A. Cordell, Lyn M. Curlin, Kevin D. Shearman, Orrill, Shearman & Cordell, L.L.C., New Orleans, Marie A. Bookman, New Orleans, for Plaintiffs-Appellants Faye Hezeau, Wife of/and Lester Hezeau.
Lawrence L. McNamara, Arthur F. Hickham, Jr., Adams and Reese, New Orleans, for Defendant-Appellant Alain Cracco, M.D.
Cristina R. Wheat, Adams and Reese, New Orleans, for Defendants-Appellants La. Patients' Compensation Fund, La. Patients' Compensation Fund Oversight Board, and Commissioner of Insurance, State of Louisiana.
James J. Danna, Waller & Associates, Metairie, for Intervenor-Appellee the Travelers Insurance Company.
Before BARRY, KLEES and McKAY, JJ.
KLEES, Judge.
These consolidated appeals arise from a medical malpractice action brought by plaintiffs Lester and Faye Hezeau against Dr. Alain Cracco as a result of surgery performed on Mr. Hezeau on July 27, 1987. Following a bench trial, the court found that Dr. Cracco did not commit malpractice in the treatment or diagnosis of the post operative wound, but found that plaintiff was not adequately informed of the risks involved in the operation. On August 12, 1996, judgment was rendered in favor of Lester Hezeau and against Dr. Cracco in the amount of $317,000.00. On December 6, 1996, the trial court rendered an amended judgment, restating the award in favor of Lester Hezeau in the amount of $317,000.00 and further awarding Faye Hezeau $35,000.00 in damages. Judgment was also rendered in favor of intervenor, The Travelers Insurance Company, in the amount of $28,000.00. In addition, the trial court stated that Dr. Alain Cracco was not personally liable for any amounts in excess of $100,000.00, and further ordered that the Commissioner of Insurance of the State of Louisiana comply with the provisions of LSA-R.S. 40:1299.44B upon receipt of the judgment.
Three appeals were brought from this judgment. Plaintiffs appeal from the judgment of the trial court which held that Dr. Cracco did not commit malpractice in the treatment of the post-operative wound. Defendant, Dr. Alain Cracco, appeals from the judgment insofar as it held that plaintiff was not adequately informed of the risks involved in the operation. Finally, the Commissioner of Insurance appeals the trial court's judgment which ordered the Commissioner, rather than the Louisiana Patient's Compensation Fund, to pay the amount of the judgment exceeding $100,000.00. These appeals have been consolidated for our review herein.

FACTS
Plaintiff, Lester Hezeau, was an electrical technician employed by Tenneco. In 1986, he began to experience painful symptoms in *758 his knee and was referred by Tenneco to Dr. Alain Cracco, an orthopedic surgeon. On the initial visit, Dr. Cracco diagnosed chondromalacia of Mr. Hezeau's right knee. Dr. Cracco prescribed a program of exercise and anti-inflammatory medication. Mr. Hezeau continued to have problems with his knee, and Dr. Cracco diagnosed plaintiff with arthritis in this joint and restricted him from climbing. Because of Mr. Hezeau's continuing knee problems, Dr. Cracco eventually recommended arthroscopic surgery which was performed on September 22, 1986. During the course of this surgery, Dr. Cracco smoothed and debrided the articular surface of the patient's knee joint. Dr. Cracco noted during this surgery that Mr. Hezeau had a misalignment of the joint, and subsequently recommended that plaintiff undergo surgery to repair this condition which resulted in his progressive arthritis.
Mr. Hezeau obtained a second opinion and eventually agreed to have the surgery. Mr. Hezeau's last visit to Dr. Cracco's office prior to the surgery was on July 1, 1987. The testimony at trial as to whether Dr. Cracco or his nurse discussed the surgical procedure with plaintiffs on this date was conflicting. Mr. Hezeau was admitted to the hospital for the surgery on July 26, 1987. On that date, he signed a consent form. On July 27, 1987, Mr. Hezeau underwent a procedure referred to as a wedge osteotomy of the knee.
The day following the surgery, plaintiff began to experience complications from the surgery, including a condition called "drop foot." The drop foot condition caused Mr. Hezeau to have difficulty in tipping his foot forward. At the time of the trial, Mr. Hezeau still suffered from this condition. Further, treatment of plaintiff's wound required re-admission to the hospital for debridement during September of 1987.
The parties dispute the cause of the "drop foot" condition. Plaintiffs contend that the condition was caused by a severe and longstanding infection that Mr. Hezeau incurred following the surgery. Plaintiffs argued at trial that Dr. Cracco did not properly handle the infection and the antibiotic treatment, and that Mr. Hezeau was not informed of the risk of infection. Dr. Cracco argued that the drop foot is a rare complication which in this case was not caused by infection, but rather was caused by inflammation related to circulatory and vascular problems. Dr. Cracco argued that the condition occurred absent any negligence on his part. Dr. Cracco further argued that even if the condition were caused by infection, Mr. Hezeau was warned of the risk of infection.
Following a lengthy bench trial, the trial court ruled that Dr. Cracco had complied with the standard of care in treating Mr. Hezeau. However, the trial court found that the testimony of Mr. Hezeau and his wife was credible on the issue of informed consent, and that Mr. Hezeau had not been adequately informed of the risks of surgery, and if he had been informed, he would not have undergone the procedure. It is from this judgment that plaintiffs and defendants now appeal.

Plaintiffs' Appeal
Lester and Faye Hezeau contend on appeal that the trial court was manifestly erroneous in failing to find defendant was negligent in the treatment or diagnosis of plaintiff's post-operative wound. In its reasons for judgment, the trial court stated:
The Court is of the opinion that Dr. Cracco did not commit malpractice in the treatment or diagnosis of the post operative open wound. The Court finds Dr. Ronald Nichols' testimony to be unbiased and most convincing of all medical experts who testified.
To prove medical malpractice, a plaintiff must prove the prevailing standard of care, the health care provider's violation of that standard of care, and the causal connection between the health care provider's alleged negligence and the plaintiff's claimed injuries. Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94); 643 So.2d 1228; LSA-R.S. 9:2794. The standard of care is generally that degree of knowledge of skill possessed or the degree of care ordinarily exercised by doctors licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances. LSA-R.S. 9:2794A(1).
*759 Appellate review of the trial court's findings in a medical malpractice action is limited. The standard of knowledge, skill and care for physicians is best determined from the testimony of other experts. When the medical experts express different views, judgments and opinions on whether the standard was met in any given case, the reviewing court will give great deference to the trier of fact's evaluations. Conerly v. State, 29,236 (La.App. 2 Cir. 3/3/97) 690 So.2d 980, 986, writ denied, 712 So.2d 864 (La.1998) and writ granted in part by 97-0871 (La.3/13/98), 712 So.2d 859.
It is for the fact finder to evaluate conflicting expert opinions in relation to all the circumstances of the case. Roland v. Tedesco, 616 So.2d 780 (La.App. 2d Cir.1993), writ denied, 619 So.2d 579 (La.1993). Credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which will not be disturbed on appeal in the absence of manifest error. Conerly v. State, 690 So.2d at 986.
The record in this case indicates that there was conflicting evidence as to whether Dr. Cracco breached the standard of care which caused injury to Mr. Hezeau. The trial court relied on the expert testimony of Dr. Nichols who stated that he found no negligence in Dr. Cracco's treatment of this patient.
Plaintiffs argue that even considering the weight given to Dr. Nichols' testimony by the trial court, the evidence presented at trial nonetheless overwhelmingly proves that Dr. Cracco's treatment of plaintiff's wound following the surgery was negligent. Specifically, plaintiffs argue that Dr. Cracco's prophylactic antibiotic use and the post-operative antibiotic use after the diagnosis of an infection fell below the standard of care.
Plaintiffs first contend that Dr. Cracco failed to properly administer the preoperative prophylactic antibiotics. Plaintiffs rely on the testimony of Dr. Cracco and of Dr. Nichols who stated that the standard of care required is to give the first dose of an antibiotic for prophylactic therapy before the surgery starts or during the surgery. In this case, the medical evidence indicates that Dr. Cracco administered the antibiotic approximately one hour after surgery was completed. Plaintiffs contend this was negligence.
Dr. Ron Nichols was qualified at trial in the field of general surgery and infectious disease. Dr. Nichols stated that although it is common in general surgery to administer a dose of antibiotic prior to or during the surgery, the field of orthopedic surgery is different because tourniquets are used during surgery preventing the antibiotics from reaching the site which is affected during the surgery. Further, with regard to the specific antibiotic used by Dr. Cracco, Dr. Nichols stated that the cephalosporin used are the "prophylactics drugs of choice." He stated that although he would have used a first generation drug, the third generation used by Dr. Cracco on two instances during his treatment of the patient was appropriate.
Dr. Nichols also testified that although he does not use long-term prophylatics because they are expensive and there is no evidence they reduce infection, Dr. Cracco's use of the antibiotics over the course of several days was appropriate "because there was fever and then because there was redness and then because there was an open wound that the surgeon wanted to prevent the invasion of organisms." He also stated that orthopedic surgeons use antibiotics for longer period of time than general surgeons do. He found no evidence of harm on Mr. Hezeau by the long-term use of the antibiotics.
Dr. Nichols further testified that the medical evidence failed to indicate that Mr. Hezeau developed an infection within the first few days after the surgery. Dr. Nichols stated that the medical evidence did indicate that Mr. Hezeau developed cellulitis while in the hospital in July of 1987, but that there was no proof that it was infectious.
Dr. Nichols also stated that he reviewed the medical records of Mr. Hezeau in the post-operative visits to Dr. Cracco. He stated he found no evidence of active infection in Mr. Hezeau's leg in the period of office visits between the two operations. Rather, he found there was evidence of nonhealing. He stated that Dr. Cracco's actions in trying to get the wound to heal were proper, but that *760 the wound did not heal and the muscle started to show evidence of necrosis. Dr. Nichols stated that he did not believe the necrosis was a result of infection. Dr. Nichols stated that Dr. Cracco's dual approach of using antibiotics and debridements was appropriate. Dr. Nichols disputed a notation in Mr. Hezeau's medical records that the patient had "wet gangrene," stating that the gangrene which began in Mr. Hezeau's leg was not infected.
Dr. Nichols further testified that wound healing is an individual trait, and it is difficult to state why some patients heal more quickly following surgery than others. Dr. Nichols stated that the medical records reflected that Dr. Cracco was diligent in his care of Mr. Hezeau's wound. He stated that the treatment was effective in bringing about healing of this slow healing wound. Dr. Nichols believed that the surgical techniques and the dressing changes used by Dr. Cracco were more important in the healing than the antibiotics.
Although plaintiffs rely on Dr. Nichols' testimony that Dr. Cracco may have used a different antibiotic and have administered the prophylactics sooner, we find that Dr. Nichols failed to testify that Dr. Cracco breached the standard of care so as to support a finding of medical malpractice. Although Dr. Nichols stated he may have done certain things differently in the treatment of this patient, he distinguished the field of orthopedic surgery from the field of his practice, general surgery. Dr. Nichols clearly supported Dr. Cracco's diagnosis that there was no longstanding infection, but rather that the patient was suffering from a slow-healing wound. Further, Dr. Nichols stated that the treatment administered by Dr. Cracco under the circumstances was appropriate.
The trial court found Dr. Nichols to be the most credible of all the medical witnesses and the court accepted Dr. Nichols' opinions. We have reviewed the entire record in this case, and although the medical evidence is conflicting, the trial court's decision to credit the testimony of Dr. Nichols was reasonable. We cannot say that the trial court's choice between the conflicting theories regarding the cause of plaintiff's injuries is manifestly erroneous or clearly wrong. Absent manifest error, we will not disturb the factual findings of the trial court. We therefore affirm that portion of the judgment which finds that Dr. Cracco did not commit malpractice in the diagnosis and treatment of the surgical wound.

Defendants' Appeals
Defendant, Dr. Alain Cracco, appeals from that portion of the trial court's judgment which finds that the patient was not adequately informed of the material risks involved in the operation. Dr. Cracco contends that the trial court erred in this determination when there was no expert testimony presented that the allegedly undisclosed risk was a material risk. Further, Dr. Cracco contends that the trial court erred in finding that Mr. Hezeau had not been informed of the risk of infection or drop foot, which is essentially the loss of function of his leg. Finally, Dr. Cracco contends that the trial court erred in applying a subjective standard rather than the objective standard set forth by the Supreme Court in Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1988).
The requirement of consent to medical treatment was initially based on the idea that a competent person has the right to make decisions regarding his or her own body. Lugenbuhl v. Dowling, 96-1575 (La.10/10/97), 701 So.2d 447, 450. In 1975, the Louisiana Legislature enacted La.Rev. Stat. 40:1299.40 relative to informed consent to medical treatment. In order to recover in informed consent, a plaintiff must show the physician failed to disclose a material risk, that the undisclosed risk actually occurred, and that if the risk had been disclosed, a reasonable person would have avoided the treatment and the unwanted consequences. LaCaze v. Collier, 434 So.2d 1039, 1048 (La. 1983).
Prior to the surgery in this case, Lester Hezeau signed a consent form which stated in pertinent part:
1. I hereby authorize and direct Dr. A. Cracco/Dr. J. Rauchwerk with associate or assistant of his choice to perform upon Lester Hezeau, the following surgical, diagnostic, *761 or medical procedure Arthroscopy, Valgus Osteotomy Right Tibia including any necessary or advisable anesthesia.
* * * * * *
3. Some risks known to be associated with this procedure, including anesthesia, are:
DEATH
BRAIN DAMAGE
QUADRIPLEGIA (Paralysis of all arms and legs)
PARAPLEGIA (Paralysis of both legs)
LOSS OF ORGAN
LOSS OR[OF] ARM OR LEG
LOSS OF FUNCTION OF ORGAN
LOSS OF FUNCTION OF AN ARM OR LEG
DISFIGURING SCARS

infection*
*The parties dispute whether this word appeared on the form signed by the Hezeaus.
Dr. Cracco testified at trial that this form was given to Mr. and Mrs. Hezeau when they were present at an office visit on July 1, 1987, three weeks prior to the surgery. Dr. Cracco testified that he and his nurse, Lynette Winnier, discussed the form with plaintiffs. Dr. Cracco further testified that the consent form was a standard hospital form, and that Nurse Winnier added the risk of "infection" in her own handwriting at Dr. Cracco's instruction. The form in Dr. Cracco's records was not signed by the patient; however, the form contained in the hospital records indicated that Lester Hezeau signed the consent form on July 26, 1987, the day before the surgery.
Lester Hezeau testified at trial that the form was not given to him on July 1, 1987, nor were the risks of the surgery discussed with him by either Dr. Cracco or his nurse at this time. He identified the consent form which he signed the day before the surgery, but stated that the word "infection" was not written in as a risk at the time he signed it. Mr. Hezeau testified that Dr. Cracco did not inform him of the risks of surgery, but told him "he would be dancing in 6-8 weeks." Mr. Hezeau stated that if he had known of all the complications of the surgery, he would not have undergone the surgery.
Faye Hezeau testified that she was present with her husband at the office visit on July 1, 1987, and she agreed with her husband's testimony that they were not given a consent form on that date, nor were the risks of the surgery discussed with them by Dr. Cracco or his nurse.
A consent form signed by a patient is presumed to be valid and effective. LSA-R.S. 40:1299.40; Hondroulis v. Schuhmacher, 553 So.2d at 403. The uniform consent form signed by Mr. Hezeau created a presumption that he had been advised of the risks connected with the proposed procedure and had given an informed consent.
In the Hondroulis case, the patient consulted the doctor about low back pain that radiated into the hip and leg. After attempting conservative treatment, the doctor recommended a myelogram and a laminectomy. The consent form signed by the patient, essentially tracking the risks stated in the informed consent statute, was almost identical to the form signed by Mr. Hezeau. After the surgery, the patient experience incontinency, constipation and numbness in the leg. She filed suit on the basis that she would not have undergone the surgery if she had been informed of these known material risks. The trial court granted summary judgment in favor of the doctor, finding that the patient was bound by the consent form unless material facts were misrepresented to her. The court of appeal and the Supreme Court affirmed this ruling.
However, on rehearing the Supreme Court reversed its position based on its interpretation of the informed consent doctrine and the requirement to disclose material risks. In determining the materiality of the risk, the court should define the nature of the risk and the likelihood of its occurrence. Secondly, the court should decide whether the probability of that type harm is a risk which a reasonable patient would consider in deciding on a treatment. Hondroulis, 553 So.2d at 412. The Supreme Court on rehearing reversed the summary judgment rendered in favor of the doctor, holding that the issues of whether the loss of bladder control *762 was a material risk which was not disclosed to the patient and whether a reasonable person in the patient's position would have refused the operation, had she been advised of the risk, were issues triable on the merits.
In the present case, although the consent form signed by Mr. Hezeau created a presumption of validity, the trial court was apparently persuaded by the testimony of Mr. and Mrs. Hezeau that the handwritten word "infection" was not present on the form at the time it was signed. This finding is supported by the fact that although Dr. Cracco testified the Hezeaus were informed of the risks and presented with a consent form during an office visit on July 1, 1987, Dr. Cracco failed to provide evidence of a signed consent form dated at this time which included the word "infection" as a risk. Further, the Hezeaus stated that they were not informed of the risk of infection, and had they known of the permanent effects which the infection caused, Mr. Hezeau would not have had the surgery.
We recognize that the factual findings of the trial court are accorded great weight on appeal. The trial court apparently concluded that Mr. and Mrs. Hezeau were not informed of the risk of infection in the surgery performed by Dr. Cracco. We find such a risk to be a material risk, and that a reasonable person in a patient's position would attach significance to this risk. Further, the record in this case shows that the risk of infection actually occurred. The medical evidence supports a finding that Mr. Hezeau developed cellulitis, an infection, within a few days after the surgery. Dr. Nichols testified at trial that the cellulitis was still a problem for Mr. Hezeau when he examined him in 1990, and that the condition developed as a result of the surgery performed by Dr. Cracco. Although the condition did not develop immediately after surgery, the record supports a finding that the infection was a result of the surgery.
Under the circumstances presented here, we conclude that the trial court's determination that Mr. Hezeau was not adequately informed of all material risks inherent in this surgery was not manifestly erroneous. We therefore affirm the trial court's finding which renders judgment against defendant, Dr. Alain Cracco, based on a lack of informed consent.
Finally, defendants, the Commissioner of Insurance and the Louisiana Patient's Compensation Fund (LPCF), contend that the trial court erred in stating in its judgment that the Commissioner of Insurance, rather than the LPCF, must comply with the provisions of LSA-R.S. 40:1299.44B. We agree.
LSA-R.S. 40:1299.44B provides for payment by the Louisiana Patients' Compensation Fund of amounts in excess of $100,000.00 in any judgment against a health care provider who is qualified under the Medical Malpractice Act. Dr. Cracco is qualified under the Act. Therefore, as acknowledged by the parties in oral argument before this Court, the trial court erred in naming the Commissioner of Insurance as the party responsible for complying with the provisions of the malpractice act with regard to paying the excess judgment.
Accordingly, we vacate that portion of the judgment and amend the judgment of the trial court to provide that the Louisiana Patient's Compensation Fund upon receipt of the certified copy of this judgment, comply with the provisions of LSA-R.S. 40:1299.44B. In all other respects, the judgment of the trial court is affirmed.
AMENDED, AND AS AMENDED, AFFIRMED.