# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 21, 2016 Session

## BARBARA T. COLLINS v. HCA HEALTH SERVICES OF TENNESSEE, INC., ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 14C-339 Hamilton V. Gayden, Jr., Judge**
_____

**No. M2016-00524-COA-R3-CV – Filed October 28, 2016**
_____

Appellant was injured while attempting to leave the defendant hospital against medical advice. Appellant appeals the trial court's decision to grant summary judgment in favor of the defendant hospital, concluding that the hospital owed no duty to prevent Appellant from leaving the hospital. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY ARMSTRONG, JJ., joined.

Timothy R. Holton and Carroll C. Johnson, III, Memphis, Tennessee, for the appellant, Barbara T. Collins.

Dixie W. Cooper and Kim J. Kinsler, Nashville, Tennessee, for the appellees, HCA Health Services of Tennessee, Inc. d/b/a Tristar Summit Medical Center.

## OPINION

### BACKGROUND

Because this case involves the trial court's grant of summary judgment, the facts are largely undisputed. On October 15, 2012, Plaintiff/Appellant Barbara Collins ("Appellant") was transported by ambulance to Defendant/Appellee HCA Health Services of Tennessee, Inc., d/b/a/ Tristar Summit Medical Center ("the Hospital"), located in Hermitage, Tennessee, complaining of dizziness, nausea, chest pain, and headache. After her arrival at the Hospital, Appellant was evaluated and her medical records indicate that she was "alert" and that her speech was "not slurred." According to

Appellant's medical records, Appellant had previously been diagnosed with bipolar disorder and obsessive compulsive disorder, and she was taking psychiatric medication at the time.

Appellant was admitted to the Hospital under Dr. Ronald Rentuza's ("Dr. Rentuza") care.[1] Dr. Rentuza ordered a work-up and neurology consult to determine the cause of her diplopia,[2] dizziness, and hypertension. Based on his examination of Appellant, Dr. Rentuza noted that Appellant was "awake, oriented, and in no distress at rest." As part of the work-up, Dr. Rentuza ordered an MRI of Appellant's head and neck. Dr. Rentuza ordered an increased dosage of Appellant's psychiatric medication as well as other additional medication; however, he limited Appellant's pain medication so the medication would not interfere with Appellant's neurology assessment. Nurses Maranda Coggins ("Nurse Coggins") and Ann Stenson ("Nurse Stenson") assessed Appellant frequently during her stay on October 15 and noted that Appellant was responsive and coherent in response to their questions. Appellant stated she did not have any thoughts of harming herself or others, which Nurse Coggins documented in the medical record. Later that day, Appellant told Nurse Stenson that she was "afraid she was dying and had so much she still want[ed] to do with her life." However, based on Nurse Stenson's assessment, Appellant was aware, responsive, and coherent at all times that they interacted.

The next day, on October 16, 2012, at 7:47 A.M., Nurse British Sullivan ("Nurse Sullivan") assessed Appellant and noted that she was "Awake/Alert" and oriented to person, place, time, and stimuli. Nurse Sullivan described Appellant's mood as "agitated," "anxious," "fearful," "irritable," and "tearful." Appellant again reported that she "fe[lt] like she [was] dying" and that her "head belong[ed] to someone else and [wa]s running off without her." At 8:00 A.M., Appellant was still anxious and tearful and stated that she wanted to go home. Dr. Rentuza evaluated Appellant again at 10:32 A.M. and noted that Appellant was awake, alert, oriented, and aware of her surroundings. According to Dr. Rentuza's notes in the medical record, Appellant responded appropriately to questions. At around noon, Appellant communicated that she wished to leave. Nurse Sullivan found Appellant in her room dressed, pulling out her IV, and preparing to leave the Hospital. Appellant was upset that she still had a headache and had been waiting a long time for a neurologist. Appellant stated that she was not "getting any help and c[ould] have a [headache] at home." Nurse Sullivan responded she would page Dr. Rentuza to see if Appellant could be given additional pain medication to address her headache. In response, Dr. Rentuza stated that "we are doing all that we can" and

---

[1] Dr. Rentuza works as a hospitalist at the Hospital. A "hospitalist" is "a physician specializing in hospital inpatient care." *Mosby's Dictionary of Medicine, Nursing & Health Professions* 856 (9th ed. 2013).

[2] "Diplopia" means "double vision caused by defective function of the extraocular muscles or a disorder of the nerves that innervate the muscles." *Id.* at 541.

that Appellant "could sign [an against medical advice] form ("AMA form") if [she] wanted [because Dr. Rentuza] did not want to give [Appellant] anything else for [her headache]." Nurse Sullivan "tried to get [Appellant] to stay at least until [the neurologist] came." Appellant, however, "kept repeating over and over that she [wa]s leaving and [that[ no one care[d] about her and no one [wa]s doing anything for her." Despite Nurse Sullivan's pleas, Appellant was "adamant" about walking down the street to her daughter's office. Appellant eventually refused to remain in the hospital or sign an AMA form. Although Nurse Sullivan encouraged Appellant to use the elevator, Appellant insisted on taking the emergency exit stairway from the fourth floor to the Hospital's exit.

At some point, Appellant found her way to the second floor and either fell or dropped herself to the ground. At her later deposition, Appellant admitted that she had no recollection of her fall or the events leading thereto and did not believe that she was "incompetent" while she was a patient at the Hospital. Appellant's medical record from her later hospitalization at Vanderbilt Medical Center ("Vanderbilt") indicated, however, that Appellant had informed her daughter that the fall occurred when Appellant was accidently locked onto a balcony at the hospital. Apparently believing that she could make the fifteen-foot drop to the ground, Appellant indicated that she "sat down on her bottom to scoot off the ledge because she thought she could make it [fifteen feet]." After she fell, Appellant was transported to Vanderbilt where she was treated for thoracic and lumbar burst fractures she sustained from the fall. Psychiatry consultation at Vanderbilt ruled out a potential suicide attempt.

On January 27, 2014, Appellant filed a complaint against Dr. Rentuza, Summit Medical Associates, P.C., and the Hospital in Davidson County Circuit Court alleging "negligence and malpractice" and seeking damages of $10,000,000.00. On October 7, 2015, the Hospital moved for summary judgment pursuant to Tennessee Rule of Civil Procedure 56.02, arguing that only a physician may order a patient to be detained at a hospital against her will and that the nurses employed by the hospital did not have statutory grounds to detain or involuntarily commit Appellant under Tennessee Code Annotated Section 33-6-401 *et seq.* Alternatively, the Hospital argued that it was entitled to absolute immunity under Tennessee Code Annotated Section 33-6-407(e).[3] In support of the Hospital's motion, it relied on the statement of undisputed material facts filed simultaneously with the motion, memorandum of law with attached exhibits of portions of Appellant's certified medical records, and portions of various depositions and

_____

[3] Tennessee Code Annotated Section 33-6-407(e) provides:

> A hospital, treatment resource, or health care provider shall be immune from any civil liability and shall have an affirmative defense to any criminal liability arising either from a determination relative to admission of a person to a facility or treatment resource or from the transportation of a person to and from the hospital or treatment resource.

affidavits from Dr. Rentuza and the nurses who cared for Appellant during her stay at the Hospital. On December 1, 2015, Appellant filed a response to the Hospital's statement of undisputed facts and filed a statement of additional undisputed facts, relying on psychiatrist Dr. John Griffin's affidavit. Dr. Griffin, who reviewed Appellant's medical records, formed the opinion that Appellant was not competent at the time of her admission to the Hospital and met the criteria for emergency involuntary detention pursuant to Tennessee Code Annotated Section 33-6-401 et seq. On December 9, 2015, the Hospital filed a reply memorandum and response to Appellant's statement of additional undisputed facts, attaching Dr. Rentuza's affidavit which clarified a statement in his deposition regarding his intention to visit Appellant again before her departure from the hospital.

Following a hearing, the trial court entered a memorandum on February 3, 2016, concluding that the Hospital "did not have a duty to detain [Appellant] absent a directive from a physician." On February 12, 2016, the trial court entered an order incorporating the memorandum by reference, granting the Hospital's motion for summary judgment and dismissing the claims against the Hospital with prejudice. The trial court also certified the order as final under Rule 54.02 of the Tennessee Rules of Civil Procedure.

## ISSUE

Appellant filed a timely appeal, raising one issue for review: Whether the trial court properly granted summary judgment to the Hospital.

## STANDARD OF REVIEW

In this case, only the Hospital moved for and was granted summary judgment by the trial court. Summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion and (2) the moving party is entitled to judgment as a matter of law on the undisputed facts. Tenn. R. Civ. P. 56.04. Our Supreme Court in *Rye v. Women's Care Center of Memphis, MPLLC* recently explained the burden-shifting analysis to be employed by courts tasked with deciding a motion for summary judgment:

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule

- 4 -

56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] ... supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" at the summary judgment stage "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06.

*Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264–65 (Tenn. 2015) (judicially adopting a summary judgment parallel to the statutory version contained in Tenn. Code Ann. § 20-16-101); *see also* Tenn. Code Ann. § 20-16-101 (applying to cases filed after July 1, 2011).

On appeal, this Court reviews a trial court's grant of summary judgment de novo with no presumption of correctness. *See City of Tullahoma v. Bedford Cnty.*, 938 S.W.2d 408, 412 (Tenn. 1997). In reviewing the trial court's decision, we must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999); *Muhlheim v. Knox. Cnty. Bd. of Educ.*, 2 S.W.3d 927, 929 (Tenn. 1999). If the undisputed facts support only one conclusion, then the court's summary judgment will be upheld because the moving party was entitled to judgment as a matter of law. *See White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn.1998); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn.1995).

This case presents an issue of statutory construction, which is a question of law, and questions of law are amenable to disposition by summary judgment. *Metro. Dev. & Housing Agency v. Trinity Marine Nashville, Inc.*, 40 S.W.3d 73, 76 (Tenn. Ct. App. 2000). Questions of law are reviewed de novo, affording no presumption of correctness to the trial court's determination. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 703 (Tenn. 2008).

## DISCUSSION

As we perceive it, the dispositive issue is whether the Hospital had a duty to involuntarily detain Appellant based upon the undisputed facts in the record. Generally, a claim of simple negligence requires the following elements: "1) a duty of care owed by the defendant to the plaintiff; 2) conduct falling below the applicable standard of care

amounting to a breach of that duty; 3) an injury or loss; 4) causation in fact; and 5) proximate, or legal, cause." **King v. Anderson Cnty.**, 419 S.W.3d 232, 246 (Tenn. 2013) (citing **Giggers v. Memphis Hous. Auth.**, 277 S.W.3d 359, 364 (Tenn. 2009)). In her complaint, however, Appellant alleged both "negligence and malpractice" and neither party to this appeal makes any distinction between a claim of simple negligence and a claim of medical malpractice or health care liability.[4] Indeed, for purposes of this appeal, we are not required to decide which type of action governs Appellant's claim against the Hospital because the existence of a duty is an essential element to either claim. *See* **Draper v. Westerfield**, 181 S.W.3d 283, 290 (Tenn. 2005) ("[Health care liability actions] . . .incorporate[] the common law elements of negligence."). As such, if the undisputed facts establish that the Hospital did not owe a duty of care to Appellant to prevent her injury by involuntarily detaining her, she cannot prevail in her claim against the Hospital and the trial court correctly granted summary judgment.

Appellant argues that "hospitals [owe] a duty to protect patients, who, because of physical or mental conditions, lack the capacity to recognize and avoid dangerous situations." In support, she cites three cases in which she asserts Tennessee courts have placed such a duty on hospitals. *See* **Keeton v. Maury Cnty. Hosp.**, 713 S.W.2d 314, 316 (Tenn. Ct. App. 1986); **Rural Ed. Ass'n v. Anderson**, 261 S.W.2d 151 (Tenn. Ct. App. 1953); **v. St. Thomas Hosp.**, 211 S.W.2d 450 (Tenn. Ct. App. 1947). We will proceed to discuss each of these cases in turn.

In **Keeton**, plaintiff was not provided with a urinal and felt the urge to urinate after his catheter was removed subsequent to a prostate surgery. 713 S.W.2d at 315. Although the hospital staff was aware of plaintiff's vertigo condition and of his need for assistance in getting out of bed, help was not provided when plaintiff sought assistance on several occasions. *Id.* at 315–16. After a while, plaintiff got out of bed himself and fell on his way back to bed. *Id.* at 316. The evidence showed that plaintiff's physicians did not leave orders restricting plaintiff from getting out of bed. *Id.* The trial court ruled that plaintiff was required to show that the hospital staff violated orders left by the doctor in order for the hospital to be liable for negligence; because the plaintiff's physicians did not leave such orders, the trial court dismissed the plaintiff's claim. *Id.* This Court reversed, holding that it was foreseeable that plaintiff might fall if he went to the bathroom unassisted and that "it is not necessary to prove that hospital personnel violated an order left by plaintiff's physician" in order to find the hospital liable. *Id.* at 317.

In **Anderson**, the decedent was admitted to defendant mental institution ("institution") that held itself out as equipped to care for mental patients. 261 S.W.2d at

---

[4] We are now required to use the term "health care liability" because in 2012, statutes authorizing suit against health care providers were amended to replace "medical malpractice" with "health care liability." Act of Apr. 23, 2012, ch. 798, §§ 7–15, 2012–2 Tenn. Code Ann. Adv. Legis. Serv. 274, 274–75 (codified at Tenn. Code Ann. §§ 29-26-115 to -122, -202 (2012)).

212. Decedent's doctor informed the institution that plaintiff "was deranged and there was danger that he might harm himself if not put on the ground floor and properly watched." *Id.* at 213. However, decedent was put in a bed near a window on the second floor. *Id.* at 214. While at the hospital, decedent "suffer[ed] from fears and delusions" and "was getting out of bed, walking around, going into rooms of other patients, wandering about—'out in the halls and making a nuisance of himself.'" *Id.* After a few hours, he either fell or jumped out the window and died. *Id.* at 215. This Court held that the circumstances of the case "were sufficient to raise a duty upon [the institution] to use reasonable care to protect [decedent] against the danger of his getting out of bed and harming himself, and to make it a question for the jury whether [the institution] breached this duty." *Id.* at 216.

Similarly, in *Spivey*, decedent was admitted to defendant hospital for pneumonia and high fever and was put in a bed close to an unfastened and unguarded third floor window. 211 S.W.2d at 452–53. During his stay, he was delirious and attempted to get out of bed multiple times. *Id.* at 452. Decedent's family wanted to stay with him to make sure that he stayed in bed; however, a nurse sent the family away and at the same time assured the family that hospital staff would "tie [decedent] in bed if he tries to get up," and restraints were in fact used. *Id.* at 453–54. Later that night, hospital staff noticed that decedent freed himself of the restraints and was out of bed but did nothing further to restrain him. *Id.* at 454. Decedent thereafter jumped out of the window to his death. *Id.* Though the hospital argued that decedent's injury was unforeseeable, this Court held that knowledge that the decedent was suffering from a high fever and delirium was sufficient to create a duty on defendant to protect him against the risk of getting out of bed and harming himself. *Id.* at 455.

As the preceding cases demonstrate, "[i]n Tennessee, the common-law standard of conduct to which a person must conform to avoid being negligent is the familiar 'reasonable person under similar circumstances' standard." ***Blasingame v. Church Joint Venture, L.P.***, No. 15-1038, 2015 WL 4758933, at *7 (W.D. Tenn. Aug. 12, 2015) (quoting ***Rains v. Bend of the River***, 124 S.W.3d 580, 588 (Tenn. Ct. App. 2003)). "As a general matter, this standard requires a person to exercise reasonable care under the circumstances to refrain from conduct that could foreseeably injure others." ***Rains***, 124 S.W.3d at 588 (citing ***Bradshaw v. Daniel***, 854 S.W.2d 865, 871 (Tenn. 1993)). Whether a particular conduct conforms to the standard of care is determined based on the particular facts of a case. *Id.* Typically, a "hospital owes a duty to give its **patient** such reasonable care and attention for his safety as his physical and mental condition may require; and it must use reasonable care to safeguard him against any known or reasonably apprehended danger to himself due to his mental derangement." ***Anderson***, 261 S.W.2d at 154 (emphasis added). Generally, a "patient" is a "person under medical or psychiatric care." *Black's Law Dictionary* (10th ed. 2014) *see also* ***Shockley v. Mental Health Coop., Inc.***, 429 S.W.3d 582, 591 (Tenn. Ct. App. 2013) (holding that it "is well

settled that in interpreting the meaning of a word or phrase in a rule . . ., the court may use dictionary definitions").

From our review, the cases cited above do not support Appellant's position under the unique facts of this case. In the three cases discussed above, all of the injured persons were admitted to their respective hospitals as **patients** and sustained foreseeable injuries while they were under active treatment and care of the physicians and hospital staff. Hospital staff therefore had a duty to act with reasonable care to protect those patients against foreseeable injuries with respect to each patient during their stay at the hospitals. In the instant case, however, Appellant terminated medical treatment and voluntarily decided to leave the hospital.  This is not a case where Appellant sustained her injuries **during** her stay at the Hospital. On the contrary, it is undisputed that Appellant received her injuries as she was leaving the Hospital after having refused treatment and against medical advice. Once she terminated treatment and decided to leave against medical advice, however, her status as a patient of the Hospital ceased as well as the Hospital's general duty of care to her as a patient. *Cf. **Church v. Perales***, 39 S.W.3d 149, 164 (Tenn. Ct. App. 2000) (citing ***Glenn v. Carlstrom***, 556 N.W.2d 800, 802 (Iowa 1996); ***Weiss v. Rojanasathit***, 975 S.W.2d 113, 119–20 (Mo. 1998)) (stating that "[a] physician's duty to attend a patient continues as long as required unless the physician-patient relationship is ended by . . .  the dismissal of the physician by the patient" and noting other instances where the duty ceases).

Appellant argues, however, that she should not have been permitted to refuse medical treatment and leave the hospital because she was not competent at the time of her decision. In general, all competent patients have the right to refuse medical care. As we have explained in ***Church v. Perales***, 39 S.W.3d 149 (Tenn. Ct. App. 2000):

> All competent adults have a fundamental right to bodily integrity. *See **Washington v. Glucksberg***, 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997); ***Hezeau v. Pendleton Methodist Mem. Hosp.***, 715 So. 2d 756, 760 (La. Ct. App. 1998); ***Mahan v. Bethesda Hosp., Inc.***, 84 Ohio App. 3d 520, 617 N.E.2d 714, 718 (1992); ***Shellenbarger v. Brigman***, 3 P.3d 211, 216 (Wash. Ct. App. 2000). This right is rooted in the Anglo-American tradition of personal autonomy and the right of self-determination. *See **Thor v. Superior Court***, 5 Cal. 4th 725, 21 Cal. Rptr. 2d 357, 855 P.2d 375, 380 (1993); ***In re Gardner***, 534 A.2d 947, 950 (Me. 1987); ***Brophy v. New England Sinai Hosp., Inc.***, 398 Mass. 417, 497 N.E.2d 626, 633 (1986). Included in this right is the right of competent adult patients to accept or reject medical treatment. *See **Cruzan v. Director, Missouri Dep't of Health***, 497 U.S. 261, 278–79, 110 S. Ct. 2841, 2851–52, 111 L. Ed. 2d 224 (1990).

***Church***, 39 S.W.3d at 158. The issue in this case, however, does not solely concern Appellant's decision to decline further diagnosis and treatment, but rather her decision to terminate her status as a patient and leave the hospital against medical advice. Specifically, Appellant argues that because she was suffering from a psychiatric disorder, the Hospital had a duty to "take reasonable steps to prevent [Appellant] from injuring herself." Because there is no dispute that Appellant clearly and unequivocally expressed her intention to leave the hospital, Appellant is essentially arguing that in order to protect Appellant, the Hospital had a duty to prevent Appellant from leaving the Hospital despite her unequivocal desire to do so. The answer to this question, however, cannot be determined based upon mere incompetency, but must be answered in light of Tennessee's involuntary commitment statutory scheme.

In 2000, the Tennessee General Assembly enacted the current version of the involuntary commitment statutes, which limit a hospitals' ability to detain patients without their consent. *See* 2000 Tenn. Pub. Acts, c. 947, § 1, eff. March 1, 2001 (codified in Tenn. Code Ann. §§ 33-6-401 et seq.). The statutory guidelines for emergency involuntary admission to inpatient treatment are provided in Tennessee Code Annotated Section 33-6-401 et seq. The guidelines are specific and narrow.

Under Tennessee Code Annotated Section 33-6-401, a prospective detainee may be detained by statutorily authorized persons:

> IF AND ONLY IF
> (1) [the prospective detainee] has a mental illness or serious emotional disturbance, AND
> (2) [the prospective detainee] poses an immediate substantial likelihood of serious harm under § 33-6-501 because of the mental illness or serious emotional disturbance[.]

Section 33-6-402 defines the individuals with authority to make involuntary detentions in Tennessee as: (1) an officer authorized to make arrests in the state; (2) a licensed physician; (3) a statutorily authorized psychologist; and (4) a professional designated by the commissioner under the statute. These authorized persons must have "reason to believe" that the prospective detainee meets the criteria under Section 33-6-401 before they may detain the individual. Thereafter, the detainee must immediately be examined by "a licensed physician, psychologist, or designated professional" to determine whether the individual should be admitted to the hospital. Tenn. Code Ann. § 33-6-404 (outlining the procedure for admission).[5]

---

[5] Section 33-6-404 provides:

IF

- 9 -

If the authorized person determines that the detainee is subject to admission to a hospital under the statute, then the authorized person "shall complete a certificate of need for such emergency diagnosis, evaluation, and treatment showing the factual foundation for the conclusions." Under Tennessee Code Annotated Section 33-6-403, a detainee "may be admitted and detained by a hospital . . . for emergency diagnosis, evaluation, and treatment" in very limited circumstances:

> IF AND ONLY IF
> (1) a person has a mental illness or serious emotional disturbance, AND
> (2) the person poses an immediate substantial likelihood of serious harm,. .
> . , because of the mental illness or serious emotional disturbance,[6] AND

---

(1)(A) a licensed physician, psychologist, or designated professional takes a person into custody under § 33-6-402, OR
(B) a person is brought to the physician, psychologist, or designated professional for examination under this section,

THEN
(2) the physician, psychologist, or designated professional shall immediately examine the person and decide whether the person is subject to admission to a hospital or treatment resource under § 33-6-403, AND

(3)(A) IF
(i) the person is not subject to admission, THEN
(ii) the physician, psychologist, or designated professional shall release the person, AND
(B) IF (I) the person is subject to admission, THEN (ii) the physician, psychologist, or designated professional shall complete a certificate of need for such emergency diagnosis, evaluation, and treatment showing the factual foundation for the conclusions on each item of Section 33-6-403, AND (iii) the physician, psychologist, or designated professional shall assess the person's clinical needs and need for physical restraint or vehicle security and determine the mode of transportation to the hospital in consultation with the mandatory pre-screening agent, other mental health professional familiar with the person, or a knowledgeable family member.

[6] "Substantial likelihood of serious harm," as defined under Tennessee Code Annotated Section 33-6-501, occurs in only four situations:

IF AND ONLY IF
(1)(A) a person has threatened or attempted suicide or to inflict serious bodily harm on the person, OR
(B) the person has threatened or attempted homicide or other violent behavior, OR
(C) the person has placed others in reasonable fear of violent behavior and serious physical harm to them, OR
(D) the person is unable to avoid severe impairment or injury from specific risks, AND
(2) there is a substantial likelihood that the harm will occur unless the person is placed under involuntary treatment[.]

- 10 -

(3) the person needs care, training, or treatment because of the mental illness or serious emotional disturbance, AND
(4) all available less drastic alternatives to placement in a hospital or treatment resource are unsuitable to meet the needs of the person[.]

In this case, Appellant does not dispute that the Hospital's duty was bounded by Tennessee's involuntary commitment statutes. Indeed, this Court has previously indicated that "the common law is not the only source of legal duties . . . in negligence cases." *Rains v. Bend of the River*, 124 S.W.3d 580, 588 (Tenn. Ct. App. 2003)). "In addition to the general duty to act reasonably to avoid harming others, more specific duties governing particular situations and relationships may be imposed by the [Tennessee] General Assembly." *Id.* at 588–89 (citing *Cook v. Spinnaker's of Rivergate*, Inc., 878 S.W.2d 934, 937 (Tenn. 1994)). Much like the Tennessee General Assembly can create additional duties that may not have arisen under the common law, the Tennessee General Assembly can limit those situations wherein a duty to use reasonable care arises. *See Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 860 (Tenn. 1985) (examining the limitation on duty of care evident in Tennessee's Good Samaritan law).

Here, there is no dispute that Dr. Rentuza, the only licensed physician or other authorized person to examine Appellant, never completed a certificate of need under Section 33-6-404 authorizing the Hospital to detain Appellant against her will. Appellant argues, however, that there is a dispute of material fact as to whether Dr. Rentuza had actually authorized the detention of Appellant in order that he could examine her, possibly in order to make a determination as to her competency. Specifically, Appellant argues that Dr. Rentuza's deposition testimony that Appellant "could leave against medical advice after I had seen her" indicates that Dr. Rentuza intended to examine Appellant again and that the Hospital, with Nurse Sullivan acting as its agent, had a duty to detain Appellant until after Dr. Rentuza made that examination. Appellant argues that Dr. Rentuza cannot later supplement this deposition statement with an affidavit clarifying the meaning of this statement. We respectfully disagree.

Here, Dr. Rentuza's deposition itself clearly establishes that he had already seen Appellant two hours before she left and that he did not intend to examine her again. In relevant part, Dr. Rentuza's deposition provides:

[Appellant's counsel]: [You] agree that you never told the nurse, "Tell her hang on a second, I'll be right there," did you?
Dr. Rentuza: I don't remember our specific conversion, but I don't remember telling her that.
[Appellant's counsel]: There's nothing in this note to indicate that you were going to come and see [Appellant], correct?
Dr. Rentuza: No, because I just saw her two hours ago.

[Appellant's counsel]: So you made the decision at that point, even though you were in the hospital, not to come see [Appellant] and evaluate her before she left the facility, correct?

Dr. Rentuza: Based on my encounter with her two hours prior to that, yes.

Despite Appellant's contention otherwise, Appellant has not shown a genuine dispute of material fact by taking a fragment of Dr. Rentuza's testimony out of context. Taking Dr. Rentuza's deposition as a whole, in addition to his later-filed affidavit, it is clear that Dr. Rentuza never directed Nurse Sullivan to detain Appellant or otherwise made any indication that he intended to examine her again. While Dr. Rentuza's statement might have been ill-defined when read on its own,[7] doctors are not lawyers and the clear import from his deposition testimony is that Dr. Rentuza did not intend to detain her or examine her again prior to her departure. Accordingly, there is no dispute in the record that Dr. Rentuza never signed, nor intended to sign a certificate of need, that would have authorized the Hospital to detain Appellant under the involuntary commitment statutes.

Despite the statute's clear language of conferring the authority to detain patients only to specific persons, Appellant next argues that the involuntary commitment statutes should be interpreted to give nurses and other hospital employees the authority to detain patients. Appellant cites no binding authority but rather relies on a 2007 Tennessee Attorney General's opinion for the proposition that nurses may initiate involuntary commitment proceedings. *See Detention of Mentally Ill Patients*, No. 07-92, Tenn. Op. Att'y Gen., 2007 WL 1876294 (2007). "Our role is to determine legislative intent and to effectuate legislative purpose." *Mills v. Fulmarque*, 360 S.W.3d 362, 368 (Tenn. 2012). "The text of the statute is of primary importance, and the words must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." *Id.* "'When the language of the statute is clear and unambiguous, courts look no farther to ascertain its meaning.'" *Id.*

The involuntary commitment statute pursuant to Section 33-6-402 is clear that only the listed persons are authorized to detain patients against their will. Nurses simply are not listed as authorized individuals under Section 33-6-402. Expanding the scope of this section would frustrate both the letter and spirit of Title 33 applicable to protect the autonomy of mental health patients from unreasonable interference. *See* Tenn. Code Ann. § 33-3-101(a) ("No person shall be deprived of liberty on the grounds that the person has or is believed to have a mental illness, a serious emotional disturbance, a developmental disability, or is in need of service for such a condition except in accordance with [Title 33].");  *id.* § 33-3-101(b) ("A person with mental illness . . . has the same rights as all other persons except to the extent that the person's rights are curtailed in accordance with [Title 33] or other law."). Thus, the involuntary commitment procedures constitute

---

[7] At oral argument, counsel for the Hospital revealed that English was not Dr. Rentuza's first language.

exceptions to the general rule that mental health patients' rights should not be curtailed, and "exceptions to the general statutory provision[s] should be narrowly construed." *State v. Sundahl*, No. E2006-00569-CCA-R3-CD, 2007 WL 1280724, at \*4 (Tenn. Crim. App. May 2, 2007) (citing *United States v. Scharton*, 285 U.S.518, 52 S. Ct. 416 (1932)). Accordingly, we respectfully decline to expand the scope of Section 33-6-402, and to usurp the Tennessee General Assembly's authority, by adding nurses to the list of persons authorized to detain patients absent properly executed involuntary commitment proceedings.

Even considering the Attorney General's opinion as persuasive authority in this case, see *Silliman v. City of Memphis*, 449 S.W.3d 440, 460 (Tenn. Ct. App. 2014), *appeal denied* (Nov. 12, 2014) (quoting *State v. Black*, 897 S.W.2d 680, 683 (Tenn.1995)) ("Opinions of the Tennessee Attorney General are 'persuasive' . . . and 'entitled to considerable deference.'"), Appellant nevertheless mischaracterized its application to the facts of this case. According to the Attorney General's opinion, nurses may initiate an emergency response to an emergency situation through the use of force only **after** a physician or other authorized persons has determined that the patient is subject to admission and signs a certificate of need for emergency diagnoses, evaluation, and treatment. *Detention of Mentally Ill Patients*, 2007 WL 1876294, at \*2–3. The Attorney General's opinion opines that the signing of the certificate of need may create a "duty on the hospital to detain the person pending transportation to a psychiatric facility, using force, if necessary, to accomplish the detention." *Id.* at \*3. Thus, rather than authorizing nurses to initiate involuntary commitment procedures, as Appellant suggests, the Attorney General's opinion clearly affirms the fact that only a physician or other statutorily authorized persons may initiate the proceedings and that the Hospital's duty does not arise until **after** a certificate of need has been signed.

Finally, Dr. Griffin, Appellant's expert witness, states in his affidavit that Appellant was subject to involuntary commitment because she was "suffering from a psychiatric disorder at the time of her hospitalization." Dr. Griffin therefore opines that it was a deviation of the standard of care to allow Appellant to leave the Hospital against medical advice. Even taking Dr. Griffin's opinion as correct, however, we conclude that his statements are insufficient to establish a duty on the Hospital to prevent Appellant from leaving. As previously, discussed, the involuntary commitment statutes provide the isolated and narrow circumstances in which a hospital may detain an individual without his or her consent. Specifically, "a licensed physician, psychologist, or designated professional" must sign a certificate of need indicating that the requirements of the involuntary commitment statutes have been met. There is no dispute that even though Appellant was examined by a licensed physician, no certificate of need was ever signed. Without a certificate of need, the Hospital and its nurses, had neither the ability nor the duty to detain Appellant.

In our view, Appellant and Dr. Griffin appear to argue that Dr. Rentuza breached the applicable standard of care in failing to properly diagnose Appellant with a psychiatric disorder and thereafter detain her pursuant to the involuntary commitment statutes. Appellant's claim against Dr. Rentuza remains viable.[8] This appeal, however, involves only the direct liability of the Hospital regarding its failure to detain Appellant.[9] We simply cannot hold that the Hospital had any duty to detain Appellant where no certificate of need had been properly signed. Without this certificate, the Hospital was required to acquiesce in Appellant's desire to refuse medical treatment and leave the facility. To hold otherwise would be to place the Hospital between the proverbial Scylla and Charybdis:[10] on the one hand, arguably negligent for failing to detain Appellant; on the other, arguably having committed an intentional tort for detaining Appellant where no certificate of need was signed by an authorized individual. *See Abeyta v. HCA Health Servs. of Tenn., Inc.*, No. M2011-02254-COA-R3-CV, 2012 WL 5266321, at *20–21 (Tenn. Ct. App. Oct. 24, 2012) (holding that plaintiff could maintain a claim against the hospital for false imprisonment because a question existed as to whether the proper procedure for involuntary commitment was followed when the hospital detained plaintiff against her will); *see also Vickroy v. Pathways, Inc.*, No. W2003-02620-COA-R3-CV, 2004 WL 3048972, at *10 (Tenn. Ct. App. Dec. 30, 2004) (holding that the only authorized persons who personally examined a prospective detainee have the legal authority to sign the certificate of need committing the prospective detainee to the hospital under the involuntary commitment statute). Such a rule is simply not appropriate. Based on these circumstances, the trial court's grant of summary judgment to the Hospital was proper because the Hospital had no duty to, and could not legally, detain Appellant as a matter of law.

## CONCLUSION

The judgment of the Davidson County Circuit Court is affirmed and this cause is remanded to the trial court for all further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant, Barbra T. Collins, and her surety, for which execution may issue if necessary.

---

[8] We express no opinion as to the merits of any of the claims remaining in this lawsuit.

[9] Appellant did not raise vicarious liability against the Hospital for Dr. Rentuza's alleged negligence in her complaint. Regardless, any question of vicarious liability is not at issue in this appeal.

[10] Scylla is "a dangerous rock on the Italian side of the Straits of Messina, opposite the whirlpool of Charybdis," used to symbolize a place "between two perils, neither of which can be evaded without risking the other." *Webster's New World College Dictionary* 1308 (5th ed. 2014).

_____

J. STEVEN STAFFORD, JUDGE